PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

AUBREY E. HENRY; DEBORAH V.
HENRY,

        *Plaintiffs-Appellants,*

        v.

JEFFERSON COUNTY COMMISSION;
JEFFERSON COUNTY PLANNING AND
ZONING COMMISSION;
SHEPHERDSTOWN MEN'S CLUB
FOUNDATION, INCORPORATED; LEDGE
LOWE HOMEOWNER'S ASSOCIATION;
WILLIAM E. LEWANDOWSKI; JOYCE
ANN LEWANDOWSKI; RICHARD
SUPER; DAN MARKEN; JOHN SIMS;
THOMAS KANE; JOHN DOES I-V,

        *Defendants-Appellees.*

No. 09-1546

AUBREY E. HENRY; DEBORAH V.
HENRY,

Plaintiffs-Appellants,

v.

JEFFERSON COUNTY COMMISSION;
JEFFERSON COUNTY PLANNING AND
ZONING COMMISSION;
SHEPHERDSTOWN MEN'S CLUB
FOUNDATION, INCORPORATED; LEDGE
LOWE HOMEOWNER'S ASSOCIATION;
WILLIAM E. LEWANDOWSKI; JOYCE
ANN LEWANDOWSKI; RICHARD
SUPER; DAN MARKEN; JOHN SIMS;
THOMAS KANE; JOHN DOES I-V,

Defendants-Appellees.

No. 09-2021

Appeals from the United States District Court
for the Northern District of West Virginia, at Martinsburg.
John Preston Bailey, Chief District Judge.
(3:06-cv-00033-JPB)

Argued: December 8, 2010

Decided: March 3, 2011

Before WILKINSON and NIEMEYER, Circuit Judges,
and Patrick Michael DUFFY, Senior United States District
Judge for the District of South Carolina,
sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Niemeyer and Senior Judge Duffy
joined.

**COUNSEL**

**ARGUED:** Linda M. Gutsell, Martinsburg, West Virginia; David Hart Nelson, Charlottesville, Virginia, for Appellants. James Robert Russell, SHUMAN, MCCUSKEY & SLICER, PLLC, Morgantown, West Virginia; Braun A. Hamstead, HAMSTEAD & ASSOCIATES, LC, Martinsburg, West Virginia, for Appellees. **ON BRIEF:** Tamara J. DeFazio, SHUMAN, MCCUSKEY & SLICER, PLLC, Morgantown, West Virginia, for Appellees Jefferson County Commission, Jefferson County Planning and Zoning Commission, William E. Lewandowski, Dan Marken, John Sims, and Thomas Kane.

---

**OPINION**

WILKINSON, Circuit Judge:

We are asked once again to intervene in a decades-old land-use dispute between Aubrey Henry and the sundry local government bodies and neighboring residents who played a part in turning back his development plans. Henry chiefly alleges that the defendants took his property by granting him a less intensive conditional use permit than the one to which he claims he was entitled. Because he had no such entitlement and because his numerous other claims are without merit, we affirm the district court's grant of summary judgment to defendants.

I.

We begin by begging the reader's indulgence as we summarize the frequently litigated facts underlying Henry's claims and the byzantine procedural history accompanying them. Henry owned or had an interest in four adjoining parcels of land totaling 13.69 acres in Jefferson County, West Virginia. He resided in a single-family home on Parcel A, his

mother resided in a similar home on Parcel B until her death in 2004, and Parcel D was unimproved.

Although a 1988 zoning ordinance designated all of the land as rural-agricultural, *see generally* Jefferson County, W. Va., Zoning and Development Review Ordinance § 5.7 (1988), Henry for years had been operating a restaurant on Parcel C. In February 1993 the restaurant burned down. Allegedly acting on the erroneous advice of the zoning administrator, Henry applied in January 1994 for a Conditional Use Permit ("CUP") to build 76 townhouses on some of the property rather than attempting to rebuild the restaurant.

Under the ordinance's Development Review System, proposals are first subjected to a Land Evaluation Site Assessment ("LESA"). Henry's proposal received a score of 39.04. Any score under 60 passes, and proposals with scores closer to 0 are viewed more favorably than those whose scores approach 60. Members of the community expressed concerns about the project at a Compatibility Assessment Meeting, and the Jefferson County Planning and Zoning Commission (the "Planning Commission") denied the CUP application. The Board of Zoning Appeals ("BZA") upheld the denial, but the West Virginia Supreme Court of Appeals reversed and remanded on the grounds that the BZA failed to set forth sufficient factual findings. *See Henry v. Jefferson Cnty. Planning Comm'n*, 496 S.E.2d 239, 242 (W. Va. 1997). On remand the BZA again denied the 1994 CUP application, and the Circuit Court of Jefferson County affirmed.

While his claims were pending before the West Virginia Supreme Court of Appeals, Henry also filed his first federal lawsuit, which the parties call *Henry I*. After the resolution of his state supreme court case, we affirmed the district court's grant of summary judgment on Henry's procedural due process challenge to the zoning ordinance but reversed the district court's decision to abstain from hearing Henry's other

claims. *See Henry v. Jefferson Cnty. Planning Comm'n*, No. 99-2122, 2000 WL 742188 (4th Cir. June 9, 2000) (appeal of *Henry I*). Once the case wended its way back to us after remand, we affirmed the grant of summary judgment on his substantive due process claim but held that his takings claim was not ripe because he had not attempted to secure compensation in state court. *See Henry v. Jefferson Cnty. Planning Comm'n*, 34 F. App'x 92 (4th Cir. 2002) (appeal of post-remand *Henry I* consolidated with another suit Henry had filed, *Henry II*).

In January 2001 Henry applied for another CUP for a 76-unit townhouse development. He received another 39.04 LESA score, and although members of the public again expressed their concerns at the Compatibility Assessment Meeting, the Planning Commission voted unanimously to grant Henry's request, although limiting the number of units to 51 (including Henry's residence). However, several neighboring landowners, including the Shepherdstown Men's Club, William and Joyce Lewandowski, and Miriam Wilson, appealed the Planning Commission's decision. Ultimately, the Circuit Court of Jefferson County reversed because the Planning Commission failed to enter sufficient factual findings. Shortly thereafter Henry filed another federal suit, *Henry III*. In October 2003 he applied for a variance to rebuild the restaurant, which the BZA denied because allowing the request would have permitted Henry to circumvent the CUP process and because Henry's right to rebuild had expired. Henry did not appeal.

There was some delay in dealing with Henry's 2001 CUP application after the state court remanded it. In October 2004 Henry's counsel appeared before the Planning Commission to request a hearing on the application. At the meeting William Lewandowski, by that time a member of the Planning Commission and a defendant in *Henry III*, spoke strongly against Henry's ongoing litigation and declared that he would not recuse himself from considering Henry's CUP.

The Planning Commission soon decided to consider anew the unresolved issues in Henry's 2001 CUP application, and at a December 2004 public hearing Henry's counsel, the Planning Commission, and some of the project's opponents discussed them. By this time Lewandowski had recused himself from considering Henry's application. At the meeting Henry agreed to resolve the remaining issues, though not necessarily in the manner requested by the Planning Commission, and he agreed again to reduce the development from 76 to 51 units. Nonetheless, at a January 2005 meeting the Planning Commission granted Henry a CUP that allowed for only one unit per 40,000 square feet, for a total of 14 units. Although the Circuit Court of Jefferson County reversed the CUP's condition that Henry appeal the decision to the BZA, it affirmed the remainder of the CUP. By January 2006 Henry had sold the property to investors led by Peter Corum.

But the litigation, which by now resembled a chronicle of the Tudor dynasty, did not stop. In March 2007 — two years after the district court had dismissed *Henry III*'s takings claim as unripe — Henry finally sought compensation in state court, suing the Planning Commission for taking his property in violation of the West Virginia Constitution. The Circuit Court of Jefferson County held that statutory immunity barred Henry's claims. It also refused to allow him to add a mandamus action for compensation, reasoning with the Planning Commission that Henry's specific reservation of his federal claims and pursuit of those claims in another pending federal action — *Henry IV*, filed in March 2006 — rendered any amendment to the complaint futile. Henry did not appeal. In November 2006 the BZA granted Peter Corum, Henry's successor in title, a CUP for a mixed commercial-residential development on the property.

Henry's amended complaint in *Henry IV* alleged that the Jefferson County Commission and the Planning Commission took his property without just compensation by "preclud[ing]" him from rebuilding his restaurant and denying him a mean-

ingful CUP. Among other claims, he also alleged that various county entities and officials, as well as private opponents, violated his substantive and procedural due process rights.

The district court granted summary judgment against Henry on every claim, and he unsuccessfully moved to vacate the judgment after *Caperton v. A.T. Massey Coal Co., Inc.*, 129 S. Ct. 2252 (2009). He now appeals both of these decisions.

## II.

## A.

The hurdles to Henry's claims, both procedural and substantive, are so numerous that the district court was plainly right in dismissing them. On the procedural front, there is considerable question whether Henry's takings claims should even be in federal court. *See San Remo Hotel, L.P. v. City and County of San Francisco*, 545 U.S. 323 (2005) (applying ordinary preclusion principles to takings plaintiffs); *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985) (takings plaintiffs must first pursue compensation in state court).

Be that as it may, the substantive obstacles to Henry's contentions are even more forbidding. Henry claims that the Planning Commission took his property by granting him a 14-unit CUP rather than the 51-unit CUP to which he claims he was entitled. We start by discussing whether Henry was entitled to the larger CUP under West Virginia law; "[t]he analysis in a takings case necessarily begins with determining whether the government's action actually interfered with the landowner's antecedent bundle of rights." *Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322, 330 (4th Cir. 2005). Henry argues that the terms of the Jefferson County ordinance itself and *Far Away Farm, LLC v. Jefferson County BZA*, 664 S.E.2d 137 (W. Va. 2008), a decision interpreting that ordinance, illustrate his entitlement to the CUP.

This is incorrect. Henry argues his proposal fell under certain heightened density provisions that entitled him to a CUP of over a hundred units. It is true that § 5.7 of the Jefferson County zoning ordinance allows for densities higher than those ordinarily available if a developer secures a CUP, and § 5.7(b) does state that satisfying the Development Review System triggers the heightened density limits of Article 5.4(b). But it is simple bootstrapping to say that Henry was entitled to a larger CUP because those who secure a CUP can have heightened densities. As we have already noted in *Henry II*, "Henry [was] not entitled as a matter of right to a permit for his [earlier] high-density townhouse project" because "the issuance of [such a] permit is within the discretion of the [Planning Commission]" under the ordinance. *Henry v. Jefferson Cnty. Planning Comm'n*, 34 F. App'x at 97. And Henry himself appears to have backtracked from his claimed entitlement, stating that he "applied for a CUP to build more units than he was allowed as of right." Reply Br. of Appellants at 20.

Henry also argues that under *Far Away Farm*, once he agreed in principle to resolve all issues, the Planning Commission was obligated to issue the CUP. We disagree. In *Far Away Farm*, the West Virginia Supreme Court of Appeals held that a developer who presents uncontradicted expert evidence rebutting anecdotal concerns about a project is entitled to a CUP under the ordinance. *See Far Away Farm*, 664 S.E.2d at 144–45. But *Far Away Farm* cannot mean that the ordinance grants an entitlement wherever a developer claims to have resolved outstanding issues. In *Jefferson Orchards, Inc. v. Jefferson County BZA*, 693 S.E.2d 781, 788 (W. Va. 2010), the Supreme Court of Appeals affirmed the denial of a CUP where there was conflicting evidence regarding the average density near a project, noting that "density is a fair consideration" under the ordinance.

Read together, these cases illustrate that when a developer's uncontradicted expert evidence resolves outstanding

issues, the Planning Commission lacks discretion to deny the CUP. In the absence of such circumstances, however, the Commission may properly consider density in using its discretion to resolve murkier requests. *Jefferson Orchards*, not *Far Away Farm*, controls here. Henry presented no expert testimony on density, and the Planning Commission explicitly cited density in granting only a 14-unit CUP. It had discretion to do so, and as a result Henry was not entitled to a 51-unit CUP. He thus cannot claim that the Planning Commission took his property simply by granting a smaller CUP.

B.

Henry also alleges that the grant of the smaller CUP took his property under ordinary regulatory takings doctrine. To begin with, we are reluctant to push the notion that the denial of a permit in which one has no property interest can somehow amount to an unconstitutional taking. Moreover, it is obvious that the grant of the smaller CUP did not unacceptably interfere with Henry's existing property interests under the regulatory takings framework.

It has long been recognized that property regulations that go too far take a landowner's property. *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). Where a regulation causes a physical invasion of an owner's land or deprives the land of all economic value, the landowner must be compensated. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005).

The Planning Commission's action on Henry's CUP request never subjected his property to physical invasion, nor did it eliminate the property's value. Even were we to assume the 14-unit CUP was not economically feasible, the various parcels retained permitted uses that obviously possessed economic value. Single-family homes still stood on two of the parcels, a use to which landowners in the rural zone are expressly entitled under § 5.7(a) and whose economic value the Supreme Court explicitly indicated will defeat a claim to

total worthlessness. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 632 (2001). Henry himself asserts that more such single residence lots could have been created on the other parcels as well. Henry's case thus does not fall into the small band of regulations destroying all economic value. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1006–07, 1027–28 (1992) (regulation prohibiting the erection of any permanent habitable structures constituted a taking).

Outside of these narrow categories, we assess regulatory takings claims under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978), looking to the regulation's economic harm, its interference with parties' "investment-backed expectations," and "the character of the governmental action." *Lingle*, 544 U.S. at 538–39 (quoting *Penn Central*, 438 U.S. at 124) (internal quotation marks omitted). The *Penn Central* factors create an all-things-considered standard "designed to allow 'careful examination and weighing of all the relevant circumstances,'" *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (quoting *Palazzolo*, 533 U.S. at 636 (O'Connor, J., concurring)), but Henry's takings claim does not measure up under any one of them.

Neither the zoning regulations nor the CUP permitting decisions visited economic harm approaching constitutional magnitude. For one thing, property zoned rural-agricultural under the ordinance retained a number of valuable, expressly permitted uses; for example, Henry could have built more single-family homes, a home business, a small child or elderly care facility, a farmer's market, or a commercial greenhouse. *See* Jefferson County, W. Va., Zoning and Development Review Ordinance §§ 5.7(a)(3), (4), (6), (11), & (12). For another, he and his family achieved considerable gain from the sale of the land; he sold the restaurant and unimproved parcels to Corum and his group of investors for $500,000, his home and its parcel for another $500,000, and his sisters sold his mother's parcel to Corum's group for $300,000.

Henry has not pointed to anything that would reliably allow a court to assess the diminution in value occasioned by the so-called regulatory taking. Indeed, on appeal Henry did not even bother to point to evidence regarding the land's value until his reply brief. But even taking highly speculative projections in the light most favorable to Henry, there is no constitutionally troubling action. His complaint prayed for $1,500,000 in compensatory damages, and he stated the estimated value of the unimproved parcels with a right to develop the townhouses at just under $2 million, *see* Reply Br. of Appellants at 16. Courts have often found no regulatory taking when presented with diminutions of this scale. *See, e.g.*, *Tenn. Scrap Recyclers Ass'n, LLC v. Bredesen*, 556 F.3d 442, 456 & n.6 (6th Cir. 2009) (noting that the Supreme Court has upheld diminutions in value of 75% and 92.5%); *Iowa Coal Mining Co., Inc. v. Monroe County*, 257 F.3d 846, 853 (8th Cir. 2001) (noting the acceptability of diminutions in value of 75%).

Even if we thought diminution in value cut in Henry's favor, the other *Penn Central* factors make clear that Henry suffered no compensable taking. Again, all of his investment-backed expectations claims are predicated on his having an entitlement. He does not. "[W]e can see absolutely no warrant for the proposition that where the government . . . merely refuses to enhance the value of real property[ ] a compensable taking has occurred." *Front Royal*, 135 F.3d at 285–86. We likewise see no warrant for requiring the Planning Commission to exercise its discretion so as to most profit Henry. And as the defendants' uncontradicted evidence indicates, Henry received significant return on his and his family's investments in the property when he sold the land to Peter Corum's investment group in 2006.

The character of the Planning Commission's action here is also inconsistent with Henry's claim to have suffered a taking. Regulatory takings doctrine seeks to "identify regulatory actions that are functionally equivalent to the classic taking in

which government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539. The Planning Commission's decision, based as it was on density and other traditional zoning concerns, did nothing like this. The Planning Commission was legitimately concerned about the project's density compared to that of nearby parcels, its potential impact on a stream, and its possible harms to an adjacent park. In response to these concerns, the Planning Commission simply "adjust[ed] the benefits and burdens of economic life to promote the common good" in a way that incidentally impacted Henry's ability to maximize the profit from the development of his land. *Penn Central*, 438 U.S. at 124. Granting Henry only a 14-unit CUP did not remotely take his property, and the district court properly granted summary judgment against him on this claim.

### C.

Henry also contends that the defendants took his property by denying him permission to rebuild his restaurant. We can easily dispose of this claim. Henry applied for permission to rebuild the restaurant in 2003, ten years after it burned down. Henry justifies his delay by contending that Paul Raco, the zoning administrator, wrongly told him he could not rebuild the restaurant as of right. But even assuming (despite some of Henry's own statements) that Henry did not rebuild because Raco wrongly so instructed him, Henry still cannot succeed. He asks us in effect to recognize an extraordinarily broad proposition: that a zoning administrator's erroneous instruction, given during a conversation with an experienced developer, excuses the developer's failure to seek formal review of his request through established procedures, all the while preserving the developer's claims against subsequent regulatory changes and allowing him to later circumvent the CUP process.

Our own prior rulings also reject Henry's position. We noted that "Jefferson County ha[d] not prohibited [Henry]

from rebuilding" his restaurant before his 2003 application, demonstrating that Raco's alleged instruction cannot be treated as having the force of law and cannot excuse Henry's failure to use the proper zoning mechanisms and review procedures before it was too late. *Henry v. Jefferson Cnty. Planning Comm'n*, 34 F. App'x at 98. This position makes sense, as adopting Henry's view would undercut *Williamson County*'s administrative finality requirement, undermine the processes that form the backbone of local land-use decision-making, and hold planning commissions liable indefinitely for the unreviewable, unofficial statements of zoning officials. This we decline to do.

III.

Henry also claims that the CUP process violated his substantive and procedural due process rights.

A.

In the zoning context, substantive due process plaintiffs face significant hurdles. They must first prove that the state deprived them of a property interest and that its "action f[ell] so far beyond the outer limits of legitimate governmental action that *no process* could cure the deficiency." *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 827 (4th Cir. 1995). They must also overcome our oft-repeated "extreme[ ] reluctan[ce] to upset the delicate political balance at play in local land-use disputes." *Shooting Point, L.L.C. v. Cumming*, 368 F.3d 379, 385 (4th Cir. 2004) (quoting *Sylvia Dev. Corp.*, 48 F.3d at 829 (quoting *Gardner v. Baltimore Mayor & City Council*, 969 F.2d 63, 68 (4th Cir. 1992))) (internal quotation marks omitted).

Henry fails on both fronts. As we have already noted, he was not entitled to the 51-unit CUP, and any right he had to rebuild the restaurant expired well before he applied for a chance to rebuild. Moreover, the Planning Commission's

decision to grant only the smaller CUP was based on such typical zoning concerns as the low density nature of the surrounding property. "[I]ssues such as the concern over further growth . . . , the consequences of increased residential density, and the preservation of [a] community's aesthetic character" are, appropriately, "at the heart of countless local zoning disputes." *Sylvia Dev. Corp.*, 48 F.3d at 829. Once again we decline the invitation to turn federal courts into clearinghouses for alleged constitutional violations that in fact are only the routine and routinely contentious disagreements arising out of local permitting decisions.

### B.

Henry also asserts that the defendants violated his procedural due process rights during the CUP review process. The irony here is delicious. After years and years of litigation, we are met with claims that Henry has been denied procedural due process and that a host of defendants have conspired to deny him access to the courts. He claims, to take one example, that William Lewandowski — one of the challengers to Henry's 2001 CUP, a defendant in *Henry III*, and ultimately a member of the Planning Commission—spoke strongly against Henry at the October 2004 meeting. He called Henry's suit an attempt to deter public participation, stated that he would not recuse himself, and argued that the Planning Commission should not let developers like Henry "shake this Commission" through such tactics. No one disputes, however, that Lewandowski ultimately did recuse himself and did not participate in the December 2004 hearing or the January 2005 vote. Henry would have us hold that mere knowledge of a recused commissioner's opposition suffices to taint the entire zoning process. Not surprisingly, Henry refers us to no court that has done so.

*Caperton v. A.T. Massey Coal Co., Inc.*, 129 S. Ct. 2252 (2009), on which Henry relies, has no applicability here. Lewandowski's statements bear no resemblance to the singu-

lar facts of *Caperton*, where a state supreme court justice cast the deciding vote in favor of a party who had recently spent millions of dollars to help the justice win his seat. *Id.* at 2264–65. Those statements simply cannot rebut the "presumption of honesty and integrity" that attaches to the Planning Commission members who actually voted on Henry's request. *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Indeed, considered in the proper light, much of what Henry complains about is far more reflective of political opposition to his proposal than of any legal infirmity in the local zoning process.

IV.

Henry also lodged many other claims stemming from the grant of the smaller permit. We have reviewed these claims and have found no reason to upset the district court's grant of summary judgment on them. The district court acted properly to bring this litigation to an end. It is far from the only litigation that makes one wish Dickens were alive to write the sequel to *Bleak House*, but it assuredly would have provided the acclaimed novelist a raft of rich material. The case involves at bottom nothing more than a would-be developer's failure to get all he wanted in a local land-use dispute. Henry had no right to maximally develop his property, and the Planning Commission rejected his requests to do so largely to preserve something of the traditionally more rural character of the community.

It simply cannot be that takings arise in such circumstances. Local land-use decisions are about the accommodation of competing interests, attempts to create mutually acceptable solutions from the complicated mix of developers' quests to construct additional units, neighbors' search for repose, and communities' goals of stable, sustainable growth. Henry disagrees with the Planning Commission's balancing of these interests in his case, but not getting everything one wants from the permit process does not a taking make.

Holding that federal takings claims arise in circumstances such as these would operate to extinguish the Tocquevillian remnants of our democracy, to hamstring local land-use policymakers in the discharge of their duties, and to endanger the character and quality of the communities they serve. It would upset the proper balance between judicial and representative decisionmaking. And it would displace state primacy in land-use policy with a constitutional common law of zoning. This we will not do. The judgment of the district court is affirmed.

*AFFIRMED*