**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1890**

KEVIN QUINN; QUEEN ANNE'S RESEARCH AND DEVELOPMENT
CORPORATION,

                    Plaintiffs - Appellants,

          v.

THE BOARD OF COUNTY COMMISSIONERS FOR QUEEN ANNE'S
COUNTY, MARYLAND; QUEEN ANNE'S COUNTY SANITARY
COMMISSION; PH.D ROBERT M. SUMMERS; MARYLAND DEPARTMENT
OF THE ENVIRONMENT,

                    Defendants - Appellees.

Appeal from the United States District Court for the District of Maryland, at Baltimore.
George L. Russell, III, District Judge.  (1:14-cv-03529-GLR)

Argued:  May 9, 2017                                    Decided:  July 7, 2017

Before WILKINSON, TRAXLER, and AGEE, Circuit Judges.

Affirmed by published opinion.  Judge Wilkinson wrote the opinion, in which Judge
Traxler and Judge Agee joined.

**ARGUED:** David G. Sommer, GALLAGHER EVELIUS & JONES LLP, Baltimore,
Maryland, for Appellants.  Kurt James Fischer, VENABLE LLP, Baltimore, Maryland;
Nancy W. Young, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND,
Baltimore, Maryland for Appellees.  **ON BRIEF:** Anatoly Smolkin, GALLAGHER

EVELIUS & JONES LLP, Baltimore, Maryland, for Appellants. Amor Neill Thupari, VENABLE LLP, Baltimore, Maryland, for Appellees Board of County Commissioners for Queen Anne's County, Maryland and Queen Anne's County Sanitary Commission. Brian E. Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees Maryland Department of the Environment and Robert M. Summers, Ph.D.

---

WILKINSON, Circuit Judge:

Kevin Quinn, a landowner, challenges a comprehensive plan to extend sewer service to South Kent Island and a so-called Grandfather/Merger Provision designed to limit overdevelopment of the area. He asks us to protect a speculative land investment by finding a regulatory taking as well as violations of his due process and equal protection rights. Doing so, however, would invalidate a standard zoning tool whose legitimacy was recently upheld by the Supreme Court. It would also revolutionize zoning law and "frustrate municipalities' ability" to undertake basic land use planning. *Murr v. Wisconsin*, No. 15-214, slip op. at 16 (U.S. June 23, 2017). We thus affirm the district court's dismissal of Quinn's claims.

I.

Quinn and his company Queen Anne's Research own undeveloped land on South Kent Island, a community in Queen Anne's County, Maryland. Beginning in the 1950s, land speculators purchased thousands of small lots on the island. Between 1984 and 2002, Quinn bought over 200 of these undeveloped lots on South Kent Island. Quinn built homes on some of the lots and hoped to develop the rest.

His development plans were delayed because his lots could not accommodate septic systems. South Kent Island had no sewer service, so every home required the construction of a septic system. Unfortunately, the soil on the island was not well-suited to septic systems, especially those built on small lots. Shortly after Quinn began buying land, the requirements for a septic system were tightened, forcing him, as he described in

3

an affidavit, "to wait on his development plans until sewer was available on South Kent Island." J.A. 280.

County requirements also limited the construction of new septic systems, and thus the development of the small lots. The existing septic systems on South Kent Island, however, deteriorated. Many of the septic systems are now considered failing—in two developments, a full eighty percent are. As the district court noted, "[f]ailed septic systems discharge untreated or undertreated sewage onto the surface or into groundwater polluting the ground and surface waters and increasing the risk of disease caused by human contact with bacteria and viruses in human fecal matter." *Quinn v. Bd. of Cty. Comm'rs*, 124 F. Supp. 3d 586, 590 (D. Md. 2015).

Queen Anne's County created—and Quinn is now challenging—a plan to address these problems by extending sewer service to homes with failing septic systems while at the same time limiting any resulting new development. In the course of creating the plan, the County found itself whipsawed by many competing considerations and regulatory requirements. The County recognized that many lots were vacant because they could not support a septic system, but it feared also that a new sewer system might lead to excessive development. In addition, the County needed State funding for any sewer extension, but because South Kent Island was not in a "Priority Funding Area," the State of Maryland would not provide funding for a sewer extension that would serve new development. However, the County could not just exclude all vacant lots from sewer service because of a Maryland statute that requires providing a sewer connection to all properties that abut a sewer line, including undeveloped lots.

4

In order to satisfy all these various constraints, the County planned to extend sewer service to all streets with failing septic systems. Both developed and undeveloped lots on those streets would receive sewer service. In an effort to limit further development, there would be no sewer lines constructed on streets with only vacant lots. The vacant lots on those streets would be excluded from service because none would abut a sewer line. The plan also prevents future connections outside the initial service area.

In order to control excessive new development threatened by the sewer extension, the County enacted in 2014 a Grandfather/Merger Provision. Under this provision, the County would not grant a building permit for a lot smaller than the minimum size under the zoning regulations unless that lot was merged with any contiguous lots under common ownership. Many of the initial lots recorded on South Kent Island did not meet the minimum size, and a developer who owned a group of those lots would have to merge them into fewer, larger lots to obtain a building permit. If a developer, though, owned an isolated undersized lot, he would still be able to obtain a building permit. As noted by the Supreme Court in *Murr*, Grandfather/Merger Provisions are "a common means of balancing the legitimate goals of regulation with the reasonable expectations of landowners" by limiting building on lots that do not meet the current minimum lot size while ensuring that all property owners can still build on their land. *Murr*, slip op. at 16.

Taken together, the sewer extension and the Grandfather/Merger Provision would provide sewer service to the failing septic systems on South Kent Island and 632 vacant lots, many of which could not have been developed without sewer service. The plan would also exclude hundreds of vacant lots, leaving them undevelopable. The impact on

5

Quinn mirrored the impact on the entire island. He had several vacant lots that would receive sewer service and, subject to being merged with contiguous lots, will now be developable. However, Quinn also owned a large tract of nearly two hundred vacant lots that would not receive sewer service, meaning that he will continue to be unable to build on this land.

Quinn filed this action against Queen Anne's County and the Maryland Department of Environment challenging the sewer extension and the Grandfather/Merger Provision. He argued that the County had effected a regulatory taking, requiring compensation under the Fifth Amendment, and had violated his due process and equal protection rights. He also argued that the State had violated his due process rights by approving the sewer extension plan. The State filed a motion to dismiss, and the County filed a motion to dismiss or, in the alternative, for summary judgment, incorporating an affidavit from a county official describing the County's land-use plan. The district court dismissed Quinn's claim against the State and granted the County summary judgment. *Quinn*, 124 F. Supp. 3d at 600. Quinn filed a motion to amend the judgment, requesting additional discovery into the County's motivations. The district court denied the motion because Quinn's requested discovery would not create any issues of fact material to his claims. Quinn now appeals.

II.

Quinn first contends that the County took his property without compensation in violation of the Fifth Amendment by failing to provide sewer service to all of his land and by enacting the Grandfather/Merger Provision. The Takings Clause of the Fifth

6

Amendment requires compensation for "direct government appropriation or physical invasion of private property," *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005), and for, as Justice Holmes put it, "regulation [that] goes too far" in restricting the use of private property. *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). It does not, however, create an affirmative obligation on local governments "to enhance the value of real property," *Front Royal & Warren Cty. Indus. Park Corp. v. Town of Front Royal*, 135 F.3d 275, 286 (4th Cir. 1998), or require compensation for all "land-use regulations that destroyed or adversely affected recognized real property interests." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 125 (1978). Here, Quinn made a speculative investment in land that had no sewer service, and the Grandfather/Merger Provision he attacks is a "classic way" for local governments to accomplish the important goal of "preserv[ing] open space while still allowing orderly development." *Murr*, slip op. at 16. He has failed to show that either the extension of sewer service or the Grandfather/Merger Provision goes too far in interfering with his property so as to require compensation. [1]

---

[1] The County argues that Quinn's takings claim is not ripe under *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985), because Quinn failed to pursue compensation in state court. *Williamson County*, however, is a prudential standard, and "we may determine that in some instances, the rule should not apply and we still have the power to decide the case." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 545 (4th Cir. 2013). The district court elected to decide the merits of Quinn's takings claim, and we find that our doing the same here is in the interests of fairness and judicial economy.

A.

Quinn's Takings Clause claim based on his lack of sewer service fails because he never had a property interest in obtaining that service. "The Takings Clause protects private property; it does not create it." *Washlefske v. Winston*, 234 F.3d 179, 183 (4th Cir. 2000). Thus, "[t]he analysis in a takings case necessarily begins with determining whether the government's action actually interfered with the landowner's antecedent bundle of rights." *Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322, 330 (4th Cir. 2005). The property rights contained in this bundle are "determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). The property owner must show more than a mere hope or expectation; "[h]e must, instead, have a legitimate claim of entitlement." *Roth*, 408 U.S. at 577.

We have rejected a Takings Clause claim based on a municipality's failure to extend sewer service because the plaintiff, which bought the land without access to public sewer service, failed to show a sufficient property interest in that service. *Front Royal*, 135 F.3d at 287. In that case, a Virginia Annexation Court ordered a town to provide the plaintiff with sewer service, but the town put off doing so until after years of litigation. The town's unreasonable delay in providing sewer service was not a taking, though, because when the plaintiff bought the land, "it had no legitimate expectation that that land came with the public provision of sewer service." *Id.*

8

Quinn is in a similar position here. He cannot point to anything in the land records that would suggest he has a right to obtain sewer service; he bought the land knowing that development would depend on septic systems. Likewise, Maryland law does not create a property right in the access to a sewer system. *Neifert v. Dep't of Envir.*, 910 A.2d 1100, 1122 (Md. 2006). Quinn may hope for sewer service or even need it to make his investment profitable, but like the property owner in *Front Royal*, Quinn's desire for sewer service "is nothing but an inchoate interest in the conferral of a benefit to enhance market value." *Front Royal*, 135 F.3d at 286. The County's failure to confer that benefit is not a compensable taking.

Quinn attempts to manufacture a property right to sewer service through a Maryland statute which requires that when a local sanitary commission constructs a sewer line, it must provide a connection to "each parcel that abuts" that sewer line. Md. Code Ann., Envir. § 9-661(a)(1). Quinn argues that he owns property that abuts a sewer line but that will not be connected. First off, Quinn's interpretation of the statute appears incorrect. The sewer line to which Quinn refers is a so-called "interceptor line," which transports sewage from areas receiving sewer service to the treatment facility but is not designed to connect to individual properties. In responding to a question from Queen Anne's County, the Maryland Attorney General concluded that § 9-661(a)(1) does not require providing connection to "interceptor lines." 90 Md. Op. Att'y Gen. 60 (2005).

But even if the Maryland Attorney General's interpretation of the law were somehow incorrect, a local government's failure to provide sewer service in violation of state law does not create a Takings Clause claim. In fact, it would put Quinn in the same

9

position as the plaintiff in *Front Royal*, where the town missed a state court deadline to provide sewer service by nearly ten years. Perhaps, if Quinn's interpretation of the law is correct, he could get a state court to order the County to provide him with sewer connections. But like the plaintiff in *Front Royal*, he bought his land without any sewer service, and that is exactly where his land stands today.

By excluding many of Quinn's lots from sewer service, the County here does not "prohibit the realization of investment-backed expectations, but merely refuses to enhance the value of real property." *Front Royal*, 135 F.3d at 285–86. Viewed another way, Quinn cannot develop some of his lots because the land will not accommodate septic systems, not because the County will extend sewer service to other lots on South Kent Island—including some of Quinn's property. As we have recognized, finding a compensable taking in such a situation "would open an incredible Pandora's Box." *Id.* at 286. The Takings Clause simply does not create an affirmative obligation for local governments to make good on speculative private investments or to increase property owners' land value. The real constraints of costs, congestion, public health and environmental hazards, and a host of other local concerns mean that local governments may extend services to some properties but not to others. This is a trade-off inherent in local politics. It does not deprive the owners who do not receive the services of their property, so it does not give rise to a Takings Clause claim.

B.

Quinn's Takings Clause claim based on the Grandfather/Merger Provision fails as well. The provision is a standard zoning tool, is designed "for a specific and legitimate

10

purpose", *Murr*, slip op. at 17, and does "not unacceptably interfere with [Quinn]'s existing property interests under the regulatory takings framework." *Henry v. Jefferson Cty. Comm'n*, 637 F.3d 269, 276 (4th Cir. 2011).

Quinn first contends that the Grandfather/Merger Provision deprives him of all valuable use of his land and is thus a *per se* regulatory taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). In *Lucas*, the Supreme Court held that a *per se* taking occurs "where regulation denies all economically beneficial or productive use of land." *Id.* at 1015. The Court reasoned that such regulations "carry with them a heightened risk that private property is being pressed into some form of public service under the guise of mitigating serious public harm." *Id.* at 1018. For example, in *Lucas*, the regulation at issue prevented the owner of beachfront property from making any use of his land in order to preserve the coastline. The state could have achieved the same outcome by buying the land and creating a nature preserve, which would have obviously required compensation. *See id.* at 1019.

Here, for starters, the regulation is of a very different form than the regulation in *Lucas*. The Grandfather/Merger Provision does not resemble a regulation that is pressing Quinn's land "into some form of public service." *Id.* at 1018. Instead, it resembles standard zoning tools—such as minimum lot sizes, setback requirements, or restrictions on subdividing lots—that local governments use all the time to temper the density of development. *See Murr*, slip op. at 15–16. Not only are local governments concerned about congestion on roads, overcrowding in schools, overuse of sewer systems, and exhaustion of other public services, they must consider the costs of overdevelopment on

11

the environment and on the fundamental character of the community. Managing the density of development—even if it disappoints a particular developer—is thus a crucial goal of land use planning.

Quinn argues that, even if the Grandfather/Merger Provision is a common zoning tool, it deprives his property of all economically beneficial use and is a *per se* taking under *Lucas*. His complaint alleges that each of his lots was worth between $30,000 and $50,000 before the enactment of the Grandfather/Merger Provision and that he has now been "deprived of all reasonable uses of" his land. J.A. 22. An affidavit he filed later, though, clarifies that it is the lack of sewer service, not the Grandfather/Merger Provision, that leaves his "property—whether merged or unmerged—undevelopable and valueless." J.A. 285. These lots are "undevelopable and valueless" because they cannot accommodate a septic system, not because of any government action.

Quinn does not provide evidence of the effect of the Grandfather/Merger Provision on his lots that will receive sewer service, but he has at least twelve lots—subject to merger into four lots—that will. Quinn cannot point to any reason these lots cannot be developed, and it is clear that the Grandfather/Merger Provision does not deprive these lots of all economically beneficial use. The multifactor standard established by the Supreme Court's decision in *Murr* suggests that the lots subject to merger should be viewed as a collective. In that case, the Supreme Court held that the Murr siblings' two adjacent lots, which were subject to a merger provision, "should be evaluated as a single parcel" for purposes of regulatory taking analysis. *Murr*, slip op. at 17. As in *Murr*, the merged lots here are contiguous, and no physical or topographical barriers have been

12

identified that would limit joint development. *See id.*, slip op. at 18. Further, in some respects, the collective nature of the merged lots is clearer here than in *Murr*: unlike in that case, each of Quinn's lots was purchased as a speculative investment, rather than for personal use, and each lot remains undeveloped. *See id.* at 3–4. Viewed as a collective, the lots are still developable, albeit less densely than Quinn had hoped. Even if viewed individually, however, each of the twelve lots retains value for assemblage into the four lots on which Quinn can now build. Because the Grandfather/Merger Provision does not deprive Quinn of all economically beneficial use of his land, it is not a *per se* taking under *Lucas*.

C.

In the alternative, Quinn contends that the Grandfather/Merger Provision is a taking under the three-factor *Penn Central* test. The Court in *Penn Central* recognized that many regulatory takings challenges involve "essentially ad hoc, factual inquiries," but identified three significant factors: the economic harm of the regulation, "the extent to which the regulation has interfered with distinct investment-backed expectations," and "the character of the governmental action." *Penn Cent.*, 438 U.S. at 124. As with cases finding a *per se* taking, the inquiry "aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539. Quinn's challenge to the Grandfather/Merger Provision fails to satisfy any of the three factors.

The Grandfather/Merger Provision does not cause economic harm that rises to the level of a constitutional violation. As noted above, Quinn has claimed that it is the lack of

sewer service that renders much of his land valueless, so the Grandfather/Merger Provision could not, by Quinn's own admission, have affected the economic value of those lots. As to his lots that were scheduled to receive sewer service, Quinn argues that they cannot be developed separately and that some rights tied to the individual lots, such as beach access, are extinguished because there are fewer lots after the merger. He does not, however, present evidence of the actual change in value of these lots. Nonetheless, it is clear that the economic harm from the Grandfather/Merger Provision is not severe. As in *Murr*, slip op. at 18–19, Quinn can still build homes on his land; the Provision only requires that the development be less dense than he had hoped. A regulation is not a taking merely because it "prohibit[s] the most beneficial use of the property," *Penn Cent.*, 438 U.S. at 125, and the Supreme Court has upheld regulations causing diminutions in value far greater than any diminution here. *Hadacheck v. Sebastian*, 239 U.S. 394, 405, 409–10 (1915).

Next, the Grandfather/Merger Provision does not interfere with Quinn's reasonable investment-backed expectations because his investment in the land was highly speculative. Quinn claims that he bought the lots expecting to develop them individually. Even assuming this was a reasonable investment-backed expectation when he started buying the land, Quinn knew any development would require septic systems, and it was soon clear that his land would not support septic systems. As he acknowledged, he had "to wait on his development plans until sewer was available on South Kent Island." J.A. 280. Any hope of developing the land thus depended on receiving sewer service—a speculative proposition and one to which, as discussed above, Quinn had no entitlement.

14

These types of speculative hopes—dependent on receiving a government service to which the plaintiff has no entitlement—are not the reasonable investment-backed expectations relevant to the *Penn Central* analysis. *See Henry*, 637 F.3d at 277.

Finally, the character of the Grandfather/Merger Provision does not suggest a taking. Interference with property is less likely to be considered a taking when it "arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent.*, 438 U.S. at 124. Regulations that control development based "on density and other traditional zoning concerns" are the paradigm of this type of public program. *Henry*, 637 F.3d at 277. The Grandfather/Merger Provision at issue here, like the one in *Murr*, is "a reasonable land-use regulation, enacted as part of a coordinated [] state[] and local effort to preserve the . . . surrounding land." *Murr*, slip op. at 20. Local governments need to be able to control the density of development to prevent the overburdening of public services, environmental damage, and other harms. In the context of this case, specifically, the Grandfather/Merger Provision is an effort to facilitate the extension of sewer service while mitigating the potential for ensuing overdevelopment.

The Grandfather/Merger Provision is not a *per se* taking under *Lucas* or a taking under the *Penn Central* standard. It is, rather, a standard zoning provision designed to manage the density of development, a crucial part of local land use planning. To find a taking here would revolutionize zoning law and severely constrict local governments' ability to direct democratically the very nature and character of the community.

15

III.

Quinn next contends that the district court erred in dismissing his due process claims against the County and against the Maryland Department of the Environment. He argues that both the sewer extension and the Grandfather/Merger Provision violate his substantive due process rights. To succeed on this claim, he must show "(1) that [he] had property or a property interest; (2) that the state deprived [him] of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that *no process* could cure the deficiency." *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 827 (4th Cir. 1995) (emphasis in original). This is a high bar, and an action is illegitimate "only if the alleged purpose behind the state action has no conceivable rational relationship to the exercise of the state's traditional police power through zoning." *Id.* The "significant hurdles" for substantive due process claims in this area reflect "our oft-repeated 'extreme[] reluctan[ce] to upset the delicate political balance at play in local land-use disputes.'" *Henry*, 637 F.3d at 278 (quoting *Shooting Point, L.L.C. v. Cumming*, 368 F.3d 379, 385 (4th Cir. 2004)) (alterations in original).

Quinn's substantive due process challenge to the sewer extension fails because, as discussed above, Quinn never had an entitlement to receive sewer service. He bought his land knowing it lacked sewer service, and Maryland law does not recognize a property interest in access to sewer service. *Neifert*, 910 A.2d at 1122. Quinn had nothing "more than a unilateral expectation," *Roth*, 408 U.S. at 577, of his lots being included in any sewer extension, and a unilateral expectation which did not pan out is insufficient to support a substantive due process claim.

16

His substantive due process challenge to the Grandfather/Merger Provision fails because of his complete "inability to show that the [provision] bore no rational relationship to the exercise of the state's traditional police power through zoning." *Sylvia Dev. Corp.*, 48 F.3d at 828. The Grandfather/Merger Provision is patently a legitimate government action. None of the factors that suggest illegitimacy are present: Quinn does not point to any procedural irregularity; the Grandfather/Merger Provision applies generally to all lots in the area; and it is consistent with the County's longstanding desire to limit development on undersized lots. The evidence is overwhelming that the Grandfather/Merger Provision here is part of a comprehensive plan to address the serious public health and environmental problems arising from failing septic systems, obtain state funding for the sewer extension, and limit the subsequent potential for over-development. These are legitimate government goals, and the Grandfather/Merger Provision is clearly related to them. There is no substantive due process violation.

IV.

Finally, Quinn argues that the district court erred in granting the County's motion for summary judgment on his claim that the sewer extension and the Grandfather/Merger Provision violate his right to equal protection of the law by disproportionately affecting his property. The Equal Protection Clause of the Fourteenth Amendment "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Government action, though, will inevitably "differentiate in some fashion between" people, *id.*, so outside of certain suspect groups like race or national origin, "[t]he general rule is that legislation is

17

presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Thus Quinn must show that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). He has failed to do so.

Here, the County plainly has a "rational basis for the difference in treatment." *Id.* The County will provide sewer service to streets with homes with failing septic systems and, in order to comply with a state statute, all vacant lots on those streets as well. The County will not provide sewer service to streets with only vacant lots for two reasons: one, in order to obtain state funding for and lower the cost of the aforementioned sewer extension; and two, to alleviate the threat of overdevelopment brought about by the earlier sewer expansion. Moreover, the County enacted the Grandfather/Merger Provision to limit development on sub-sized lots. Any difference in treatment Quinn suffered was thus "rationally related to a legitimate state interest," *City of Cleburne*, 473 U.S. at 440, and is not a violation of his equal protection rights.[2]

---

[2] Quinn submitted a Rule 56(d) affidavit attached to his Opposition to the County's Motion for entry of judgment. However, he fails to establish how additional discovery would shake the legal foundations of the trial court's ruling. He seeks, for example, to discover the "reasons" and "motivations" and "other forces" behind the water and sewer plan and the Grandfather/Merger Provision. None of Quinn's vague speculation, however, brings into material dispute the fact that, as explained above, Quinn had no entitlement to sewer service, that the Grandfather/Merger Provision rested on recognized zoning and land use concerns and did not deprive Quinn of the economically beneficial use of his property, and did not evince the kind of arbitrariness

## V.

Quinn made a speculative investment in land that needed sewer service to be developed. He now asks us to force the County and State to assure him profitability. But finding a property interest in receiving sewer service or requiring compensation for the standard zoning tool of the Grandfather/Merger Provision would be a severe blow to communities' ability to manage growth in a constructive manner. Not putting in sewer connections can cause human waste to back up in failing septic systems; putting in new sewer connections, especially on vacant lots, can provide an impetus for excessive growth. Local governments require flexibility to expand services like sewer in response to community needs; those governments also must be able to control the density of development in order to prevent overcrowding in schools, clogging of streets, overload on sewer facilities, degradation of the environment, and a host of other concerns. As recognized in *Murr*, adding a highly dubious constitutional overlay to the already complex mixture of legal requirements risks making land use planning a well-nigh impossible undertaking. *See Murr*, slip op. at 8–9. Quinn's equal protection and due process claims are likewise without merit. The judgment of the district court is affirmed in all respects.

*AFFIRMED*

---

that would give rise to any sort of due process or equal protection claim. It is clear, therefore, that the district court did not abuse its discretion in denying Quinn's discovery request.