# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Braden's Folly, LLC, Respondent,

v.

City of Folly Beach, Appellant.

Appellate Case No. 2022-000020

---

Appeal from Charleston County
Roger M. Young Sr., Circuit Court Judge

---

Opinion No. 28148
Heard November 15, 2022 – Filed April 5, 2023

---

## REVERSED AND REMANDED

---

Danny Calvert Crowe, of Crowe LaFave, LLC, of
Columbia; and Joseph C. Wilson IV, of Joseph C. Wilson
Law Firm LLC, of Folly Beach, both for Appellant.

Keith M. Babcock, Ariail Elizabeth King, and Joseph B.
Berry, all of Lewis Babcock LLP, of Columbia, for
Respondent.

---

**JUSTICE KITTREDGE:** Respondent Braden's Folly, LLC owns two small,
contiguous, developed coastal properties on the northeast end of Folly Beach. The
City of Folly Beach amended an ordinance to require certain contiguous properties
under common ownership—like those owned by Braden's Folly—to be merged

into a single, larger property.  The ordinance did not impact the existing uses of Braden's Folly's contiguous lots.  Nevertheless, Braden's Folly challenged the merger ordinance, claiming it had planned to sell one of the developed properties, and that the merger ordinance interfered with its investment-backed expectation under the *Penn Central* test.  *See generally Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978) (stating in regulatory takings cases, courts must examine the economic impact of the regulation on the property owner's investment-backed expectations, as well as the character of the government action).  Folly Beach denied the claim of an unconstitutional regulatory taking.  Pursuant to cross-motions for summary judgment, the circuit court agreed with Braden's Folly, finding the merger ordinance effected an as-applied taking of Braden's Folly's beachfront property.  Folly Beach appeals from the grant of summary judgment in favor of Braden's Folly.  We reverse.

Underlying our application of the *Penn Central* factors is the distinct fragility of Folly Beach's coastline, which is subject to such extreme erosion that the General Assembly exempted Folly Beach from parts of the South Carolina Beachfront Management Act.[1]  This exemption gave the city the authority to act in the State's stead in protecting the beach there.  As we will describe more fully below, one of Braden's Folly's properties is contributing to worsening erosion rates on Folly Beach and, along with similarly situated properties, is threatening the existence of the entire beach in that area of the state.

Turning to the *Penn Central* test, we hold two of the three factors—the economic impact of the merger ordinance on Braden's Folly and the character of the governmental action—weigh in favor of finding the merger ordinance did not amount to a taking of Braden's Folly's properties.  We find the remaining factor—the extent to which the merger ordinance interfered with Braden's Folly investment-backed expectations—does not weigh in favor of either party.  Accordingly, we hold Braden's Folly has not suffered a taking under the *Penn Central* test.  We therefore reverse and remand to the circuit court for entry of judgment in favor of Folly Beach.

## I.

---

[1] S.C. Code Ann. §§ 48-39-250 to -360 (2008 & Supp. 2022).

## A.

In the 1890s, the United States Army Corps of Engineers (ACOE) constructed jetties in Charleston's harbor in order to protect the oceanic shipping channels. Following construction of the jetties, the sand migration in the area was disrupted, and the erosion rate in Folly Beach increased exponentially as sand left the area and was not replaced.[2]

In response to the high rate of yearly erosion, Folly Beach began engaging in periodic beach renourishment, in which millions of cubic yards of sand would be brought to the area to build the beach vertically upwards by five feet or more. Each renourishment project was funded largely (85%) by the federal government—specifically, the ACOE—in recognition of the fact that the federal government caused much of the erosion by constructing the Charleston jetties.[3]

---

[2] After the jetties were built, Folly Beach's yearly rate of erosion increased to nine feet per year. In comparison, other coastal areas in the state experience less than two feet of erosion per year. Chester W. Jackson Jr., *Mapping Coastal Erosion Hazards Along Sheltered Coastlines in South Carolina 1849 to 2015*, Dep't of Health & Env't Control vi (2017), https://scdhec.gov/sites/default/files/docs/HomeAndEnvironment/Docs/Jackson_SCShorelineReport122017.pdf.

[3] As one witness for Folly Beach explained:

> Section 111 of the 1968 River and Harbor Act[, 33 U.S.C. § 426i (2018),] provides authority for the [ACOE] to develop and construct projects for prevention or mitigation of damages caused by Federal navigation work, such as jetties. In 1987, Folly[ Beach]'s Section 111 study determined that approximately 57[%] of the erosion of Folly Beach was due to the construction and continued operation of the Charleston Harbor Federal navigation project. As a result of this determination, the cost sharing percentages were adjusted from the standard 65% federal and 35% local to 85[%] federal and 15[%] non-federal (City of Folly Beach).

(Footnote omitted.)

Nonetheless, the ACOE refused to renourish privately owned property. Therefore, in the early 1990s, Folly Beach secured perpetual easements from all of the oceanfront property owners. In granting the easements, the property owners permanently gave up their right to build oceanward of the perpetual easement line running through their properties.

Around that same time, in recognition of the quickly changing beachfront, the General Assembly exempted Folly Beach from part of the requirements of the South Carolina Beachfront Management Act. *See* S.C. Code Ann. § 48-39-290(E). Folly Beach's unique treatment under the Beachfront Management Act extends to three notable areas. First, the South Carolina Department of Health and Environmental Control (DHEC) is typically tasked with redrawing the baseline[4] every seven to ten years based on updated erosion rates. *See* S.C. Code Ann. § 48-39-285. However, in Folly Beach, the baseline was set in 1993 and is not subject to change regardless of any erosion or accretion, no matter how extreme. Second, the State typically strictly regulates any development in the beach area between the baseline and the setback line.[5] However, there is no setback line established in Folly Beach, so the city has the sole discretion to allow all types of development right up to the baseline with no oversight from the State. Finally, in a similar vein, the Beachfront Management Act prohibits oceanfront property owners from building new erosion control structures—or from repairing existing structures damaged greater than 50%—if the structures are located seaward of the

---

[4] The baseline is an invisible jurisdictional line typically drawn along the crests of the oceanfront sand dunes, and it serves as the starting point for determining the other jurisdictional line—the setback line—under the Beachfront Management Act. *See* S.C. Code Ann. § 48-39-280.

[5] The setback line "must be established landward of the baseline a distance which is forty times the average annual erosion rate or not less than twenty feet from the baseline . . . ." S.C. Code Ann. § 48-39-280(B); *see also* Jackson, *supra* note 2 (stating the average annual erosion rate for beaches in South Carolina is 1.8 feet per year); S.C. Code Ann. § 48-39-290(B) (setting forth a number of restrictions on development in the area between the baseline and setback line).

setback line.[6]  However, because Folly Beach does not have a setback requirement, oceanfront property owners may build new seawalls or repair existing seawalls all the way up to the baseline, so long as the plans are approved by the city.

**B.**

A portion of the northeast end of Folly Beach has a double row of properties.  The "A lots" are directly adjacent to the ocean-side of East Ashley Avenue, and the "B lots"—also known as "super-beachfront" lots—are closest to the ocean.  There is no road between the A and B lots, so the B lots are accessible only through the A lots.

Historically, an individual or entity would own an A lot and the contiguous B lot and would transfer the lots to a new owner simultaneously.  The B lots—all of which were undeveloped until some twenty years ago—were frequently submerged or, at best, on active beach.  Therefore, the B lots typically had little to no independent value[7] and served no purpose other than to provide beach access to the A lots directly adjacent to them.

However, beginning in the mid- to late-1990s, following Folly Beach's first round of beach renourishment, some of the B lots were elevated enough to make development possible.  As a result, over the next decade and with Folly Beach's approval, seventeen of the thirty-seven super-beachfront lot owners developed single-family residences on their B lots.  Nonetheless, the perpetual easement line runs through the B lots, preventing many B-lot owners from developing their properties and leaving the owners who did develop super-beachfront houses little buildable area to do so.[8]

---

[6] *See* S.C. Code Ann. § 48-39-290(B)(2).

[7] The B lots were often worth less than $500, and many of the owners voluntarily abandoned their B lot in tax sales.  In fact, the only reason the B lots even exist is because in the 1950s, another road was platted and paved in front of the B lots, parallel to East Ashley Avenue.  That road has long since been destroyed by the eroding beach and is now permanently lost.

[8] Accordingly, most of the new super-beachfront houses touched the edge of the

Due to the high rate of erosion in Folly Beach, the newly renourished B lots were quickly reclaimed by the sea.  In response, many of the owners who developed their B lot also built seawalls in front of their super-beachfront houses.[9]  Unfortunately, the seawalls did not stop the beach erosion and, instead, exacerbated the erosion problem for neighboring properties with undeveloped B lots and no seawalls.  The sand attrition on the neighboring properties turned into areas the ACOE dubbed "blue blobs"—giant depressions that held rain and seawater and spanned the length of multiple properties, even reaching into A lots in some places.  Because these blue blob areas were located on private property, they were not repaired by the ACOE or the periodic beach renourishment, nor were the costs to repair the blue blob areas paid for by the federal government.  Rather, the repair of the erosion on lots neighboring the super-beachfront properties was required to be paid for entirely by the City of Folly Beach or the owners of the damaged lots.  In other words, innocent property owners who had chosen *not* to develop their B lots had to pay for the damage caused by the seawalls of their neighbors' super-beachfront properties.

## C.

Each round of beach renourishment in Folly Beach was projected to last for around eight years.  However, as the number of super-beachfront houses and associated seawalls increased, so too did the frequency and cost of beach renourishment.  As is relevant to this case, the last four rounds of renourishment occurred in 2005, 2007, 2014, and 2018, and the next one is already scheduled for 2024—none of

buildable area on the B lots, with little to no space between the houses and the perpetual easement line.  In fact, between beach renourishments, the super-beachfront houses were not infrequently surrounded by the ocean on three sides.  Because the ACOE places the renourishment sand all the way up to the perpetual easement line, the vertical rebuilding of the beach occurs within mere feet of the backdoors to these super-beachfront houses.

[9] A few of the super-beachfront houses do not have a seawall.  Folly Beach and DHEC often take those unprotected super-beachfront houses "out of service" for renters due to safety concerns, usually related to the failure or overflow of the home's unprotected septic system onto active beach.  However, even super-beachfront homes with seawalls are occasionally taken out of service for similar reasons, including Braden's Folly's B lot.

which are eight years apart.  As a result, the ACOE threatened to cut off federal funding for the renourishment projects unless Folly Beach stopped allowing super-beachfront lots to be developed and attempted to unwind the existing super-beachfront development.  Given the importance of the beach to the local economy, and its inability to pay for the renourishment projects on its own, Folly Beach agreed to do so.

The city took multiple steps to reverse super-beachfront development.  For example, it created a Dune Management Area (DMA), which prohibits development within forty feet of the perpetual easement line.  The DMA affects all of the B lots.  In consequence, the DMA prohibits new development on the B lots and—should any existing super-beachfront houses be more than 50% damaged in a storm or otherwise—prevents repair of the existing structures on the B lots.

Likewise, in April 2019, Folly Beach amended its Code of Ordinances.  Notable to this appeal, Folly Beach amended its existing merger ordinance to provide that adjacent lots under common ownership may no longer be sold or developed as separate lots if (1) either lot is undersized[10] and (2) one or both lots touch the baseline.[11]  The zoning ordinances allow nonconforming uses to continue on

[10] Folly Beach's zoning ordinances set the minimum lot size at 10,500 square feet, but a grandfather clause relaxes this restriction for substandard lots that preexisted adoption of the ordinances.  Therefore, a number of nonconforming small lots exist in Folly Beach, particularly along the ocean.  As we discuss further below, the two lots at issue in this case are both less than 10,500 square feet and, thus, are nonconforming with Folly Beach's zoning ordinances.

[11] Specifically, the newly amended merger ordinance stated, in relevant part:

> (B) *Combination of lots*. If two or more lots of record . . . are in single ownership on or after March 1, 2019, . . . and if all or part of one or more of these lots do not comply with the lot area standards [requiring lots to be a minimum of 10,500 square feet in size] . . . ; and if one or both of these lots are adjacent to . . . [the] Baseline, the lots involved shall be considered to be an individual lot for the purposes of this [zoning ordinance], and no portion of these lots shall be used or sold which do not comply with the lot area standards, nor shall any division of the lots be made that leaves remaining any lot that fails to

properties affected by the merger ordinance. Likewise, the zoning ordinances prohibit the rebuilding of a nonconforming structure that is damaged or destroyed by more than 50% of its market value.[12] Thus, if an affected property owner had developed both his A and B lots, and those lots were merged by the amended ordinance, he could continue to use or rent both houses on the merged lot even though the area is zoned single-family residential. This nonconforming use could continue until one of the houses was destroyed beyond 50% of its pre-damaged market value. However, upon a 50% or more destruction of one of the houses, the zoning ordinances would prevent the rebuilding of the damaged structure, instead allowing the existence of only one house on the single, merged lot.[13]

---

comply with the lot area standards.

Folly Beach, S.C., Code of Ordinances § 168.04-01 (2022). The prior version of the merger ordinance did not apply unless both commonly owned, undersized lots touched the baseline.

[12] In particular, the reconstruction ordinance provides, in relevant part:

> (A) *More than 50% of pre-damaged market value.* In the event a nonconforming structure is damaged or destroyed, by any means, to the extent of 50% [or more] of its market value prior to such destruction, such structure shall not be restored unless in conformance with the standards for the zoning district in which it is located . . . .

> (B) *Less than 50% of pre-damaged market value.* . . . [If] a nonconforming structure . . . is damaged or destroyed, by any means, to an extent of less than 50% of its market value prior to such damage or destruction, it may be restored to its pre-damaged state provided reconstruction is initiated within 24 months and provided the reconstruction complies with all other city ordinances as well as all state and federal laws and does not create any new nonconformities.

Folly Beach, S.C., Code of Ordinances § 168.03-05 (2022).

[13] In tandem with its creation of the DMA and amendment of the merger ordinance, Folly Beach began more aggressively applying the avulsion doctrine. *See Severance v. Patterson*, 370 S.W.3d 705, 722 (Tex. 2012) ("Courts generally

With this background in mind, we now turn to the particular facts of this case.

## II.

### A.

Braden's Folly owns adjacent lots (Lot A and Lot B) on East Ashley Avenue. Both Lots are very small: Lot A is 8,377 square feet, and Lot B is 3,808 square feet.[14] Pursuant to Folly Beach's local zoning ordinances, all lots must be at least 10,500 square feet. Because Lots A and B preexisted Folly Beach's zoning ordinances, their sizes were grandfathered in upon passage of the zoning laws but are nonetheless classified as nonconforming.

When Braden's Folly acquired the Lots in 1999, there was a small house on Lot A, and Lot B was undeveloped because it was either underwater or part of the active beach. Following a beach renourishment in 2005, Lot B became developable because it had been transformed into mostly sandy beach. Therefore, between 2006 and 2007, Braden's Folly received building permits from Folly Beach and

---

adhere to the principle that a riparian or littoral owner acquires or loses title to the land gradually or imperceptibly added to or taken away from their banks or shores through erosion, the wearing away of land, and accretion, the enlargement of the land. . . . Avulsion, by contrast, as derived from English common law, is the sudden and perceptible change in land and is said not to divest an owner of title." (cleaned up)). As a result, Folly Beach filed suit against any B-lot owner who was attempting to develop his property in the near future. In particular, Folly Beach sought to prohibit B-lot owners from building on the portions of their lots that resulted from avulsion (i.e., the beach renourishment) because that land was part of the active beach and, thus, was owned by the State and protected by the public trust doctrine. The circuit court granted the property owners' motion to dismiss the lawsuit in May 2020. Folly Beach's appeal of that decision is pending in the court of appeals at this time.

[14] To be more precise, Lot B is approximately the same size as Lot A. However, taking the perpetual easement line into account, the buildable area on Lot B is only 3,808 square feet.

constructed two single-family residences—a larger, more modern one on Lot A and a smaller one on Lot B—for a total cost of $1.1 million.[15]

According to Braden's Folly, it had always intended to keep one of the Lots and sell the other—whichever of Lot A or B received the highest offer—in order to pay for the construction costs of the two houses. However, construction on the Lots finished in 2007 during the housing market collapse and Great Recession, which made selling either of the Lots financially unfeasible at that time. Nonetheless, even after the housing market recovered, Braden's Folly did not place the Lots on the market, continuing to use them for family vacations and as rental properties that grossed an average of $117,000 per year combined. It was not until February 2018 that Braden's Folly finally put the houses on the market, listing Lot A for $1.3 million and Lot B for $1.2 million.

One year later, upon the amendment of Folly Beach's merger ordinance in April 2019, Lots A and B were legally combined or "merged" into a single lot. In May 2019, Folly Beach sent a letter to Braden's Folly requesting it stop marketing the Lots separately and advising it to inform any prospective purchasers of the merger ordinance. Braden's Folly did not respond, continuing to list the Lots separately with no indicia either Lot was impacted by the merger ordinance.

Eventually, in August 2019, Braden's Folly received its first offer: a $1.1 million offer to purchase Lot A. Braden's Folly did not accept the offer, and the prospective purchasers declined to pursue the property further after learning of the existence of the merger ordinance and its impact on Lot A. Braden's Folly's realtor thereafter advised Braden's Folly to "[u]se this [offer] contract to go after the city. You might get your money and not have to sell" either Lot.

---

[15] Lot A did not have independent access to the beach except for through Lot B. Likewise, Lot B did not have independent access to a road or room for a septic system. One had to cross Lot A to access Lot B. As a result, while the homes were being constructed, Braden's Folly granted itself a series of purported easements across the Lots to provide beach access for Lot A and road access and septic lines for Lot B. We discuss the efficacy of these easements in section IV.D of the opinion.

Four months later, not having received a single other offer, Braden's Folly filed suit against Folly Beach, claiming its inability to sell was due to the existence of the merger ordinance. According to Braden's Folly, the merger ordinance had upset its reasonable, investment-backed expectation under the *Penn Central* test and amounted to an unconstitutional taking.

Subsequently, in October 2020, Braden's Folly received a second offer to purchase Lot A for $1.2 million but instructed its realtor to decline the offer as it was "unable to accept due to the City's [merger] ordinance." Upon learning of the second offer, Folly Beach informed Braden's Folly it objected "in the strongest terms to the continued marketing of these properties separately during the pendency of this lawsuit." Braden's Folly again ignored the city's correspondence. Rather, despite receiving only two offers in nearly two-and-a-half years, Braden's Folly inexplicably raised the listing price for Lot B to $1.25 million.

In December 2020, Braden's Folly received a third offer, this time to purchase Lot B for $1.2 million. When Braden's Folly informed the prospective purchaser (Christopher Bonner) of the merger ordinance and pending litigation, Bonner stated he did not care whether the properties were merged and "would still like to get the [Lots] under contract." Therefore, on January 4, 2021, Bonner offered $2.2 million for Lots A and B together. The offer did not have an expiration date, but Braden's Folly did not respond, later claiming it had no intention of selling during litigation or "below market value."

Having received no response, one week later, on January 11, 2021, Bonner unilaterally raised his offer to $2.55 million for Lots A and B—full asking price. Again, Braden's Folly did not respond to the offer. That same day, the listing for Lot A was removed from the internet. Three days later, the listing for Lot B naturally expired and was removed from the internet.

For the next two weeks, Bonner repeatedly attempted to get a response from Braden's Folly, reiterating his $2.55 million offer on numerous occasions. Meanwhile, an unrelated property went on the market just down the street from Lots A and B, and Bonner purchased that lot instead.

On January 28, 2021, after Bonner had acquired the other nearby lot, Braden's Folly reached out to Bonner, purportedly attempting to accept Bonner's $2.55 million offer for both Lots. However, Bonner replied that he had purchased

another property nearby and no longer had as high a motivation to purchase Lots A and B.  Because Bonner now intended Lots A and B to be purely investment properties, rather than ones he would live on with his family, he lowered his offer for Lots A and B to $2 million.  Braden's Folly countered, stating it would accept $2.6 million (i.e., higher than Bonner's initial offer when he was a more motivated buyer).  Bonner declined to purchase the Lots at that price.  Because the Lots have remained off the market since January 2021, Braden's Folly has not received any further offers to purchase Lots A and B, whether merged or separate.

**B.**

In the interim, the pending takings lawsuit progressed, and Braden's Folly and Folly Beach filed cross-motions for summary judgment.  The circuit court ultimately granted summary judgment to Braden's Folly, finding the merger ordinance constituted an as-applied taking because it unreasonably interfered with Braden's Folly's investment-backed expectation to sell the Lots separately.  The circuit court held a property owner's reasonable investment-backed expectations are defined at the time the investment is made, and Braden's Folly intended to sell one of the Lots when it constructed the houses in 2006 and 2007.  Likewise, the circuit court found the merger ordinance had an impermissibly detrimental economic impact on the value of the Lots, citing an alleged $508,000 market value loss calculated by an appraiser hired by Braden's Folly during litigation.  Lastly, the circuit court found the character of the merger ordinance was akin to a classic taking, explaining that, while merging "undeveloped or partially developed properties may not amount to a regulatory taking, . . . forcing two single-family residential houses to be merged into one property amounts to a taking."[16]  The circuit court therefore concluded that "all" of the *Penn Central* factors weighed in

---

[16] While the amended ordinance merged a number of lots, in many cases, one or both of the lots merged was undeveloped.  Moreover, some of the developed B lots are owned by a different entity than the A lots.  Because those adjacent A and B lots are not contiguous *and* owned by the same entity, the merger ordinance does not apply to them.  There are only five developed B lots owned by the same entity as the A lots, so aside from Braden's Folly, there are only four other property owners for whom the merger ordinance merged two *developed* lots.  None of those property owners sued Folly Beach over the merger ordinance.

favor of Braden's Folly, and that the merger ordinance as-applied to the Lots amounted to a regulatory taking.

Folly Beach directly appealed to this Court pursuant to Rule 203(d)(1)(A)(ii), SCACR (stating the notice of appeal should be directly filed with the clerk of this Court if the appeal involves a constitutional challenge to a municipal ordinance).

## III.

In reviewing the grant of summary judgment, this Court applies the same standard as the circuit court. *Byrd v. City of Hartsville*, 365 S.C. 650, 656, 620 S.E.2d 76, 79 (2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), SCRCP. The Court must view the evidence and all reasonable inferences taken from it in the light most favorable to the non-moving party. *Osborne v. Adams*, 346 S.C. 4, 7, 550 S.E.2d 319, 321 (2001).

The question of whether a taking has occurred is a question of law that this Court reviews de novo. *Dunes W. Golf Club, L.L.C. v. Town of Mt. Pleasant*, 401 S.C. 280, 314, 737 S.E.2d 601, 619 (2013) (first citing *Carolina Chloride, Inc. v. Richland Cnty.*, 394 S.C. 154, 171, 714 S.E.2d 869, 877 (2011); and then citing *Ex parte Brown*, 393 S.C. 214, 224, 711 S.E.2d 899, 904 (2011)).

## IV.

The Takings Clause of the Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V; *see Chi., Burlington & Quincy R.R. v. City of Chi.*, 166 U.S. 226, 239 (1897) (making the Takings Clause applicable to the States via the Due Process Clause of the Fourteenth Amendment).[17] "As its text

---

[17] The South Carolina Constitution has a similar Takings Clause. *See* S.C. Const. art. I, § 13. The takings analysis under the South Carolina Constitution is identical to the analysis under federal law. *Byrd*, 365 S.C. at 656 n.6, 620 S.E.2d at 79 n.6. Because neither party raises the Takings Clause in the South Carolina Constitution, we do not discuss it further.

makes plain, the Takings Clause does not prohibit the taking of private property, but instead places a condition on the exercise of that power," namely, the payment of just compensation to the affected property owner. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005) (quoting *First Eng. Evangelical Lutheran Church of Glendale v. Cnty. of L.A.*, 482 U.S. 304, 314 (1987)) (internal quotation marks omitted).

"The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Id.* at 537. However, beginning with its decision in *Pennsylvania Coal v. Mahon*, 260 U.S. 393 (1922), the United States Supreme Court recognized that "government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Lingle*, 544 U.S. at 538; *see also Byrd*, 365 S.C. at 656, 620 S.E.2d at 79 ("An inverse condemnation may result from the government's physical appropriation of private property, or it may result from government-imposed limitations on the use of private property.").

The question of what constitutes a regulatory taking for purposes of requiring just compensation has proven considerably difficult for courts to answer. *Penn Cent.*, 438 U.S. at 123. In *Mahon*'s "storied but cryptic formulation, 'while property may be regulated to a certain extent, if [the] regulation goes too far it will be recognized as a taking.'" *Lingle*, 544 U.S. at 538 (quoting *Mahon*, 260 U.S. at 415). "The rub, of course, has been—and remains—how to discern how far is 'too far.'" *Id.*; *see also Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017) (recognizing that a regulation "can be so burdensome as to become a taking, yet the *Mahon* Court did not formulate more detailed guidance for determining when this limit is reached"); *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) ("Since *Mahon*, we have given some, but not too specific, guidance to courts confronted with deciding whether a particular government action goes too far and effects a regulatory taking.").

In answering that question, the Supreme Court, "quite simply, has been unable to develop any 'set formula.'" *Penn Cent.*, 438 U.S. at 124; *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012) (recognizing there is "no magic formula"). Nonetheless, it has articulated two overarching principles that should guide all takings decisions. First, a court's analysis must be "informed by the purpose of the Takings Clause, which is to prevent the government from 'forcing

some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Palazzolo*, 533 U.S. at 617–18 (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)); *Andrus v. Allard*, 444 U.S. 51, 65 (1979) ("The Takings Clause, therefore, preserves governmental power to regulate, subject only to the dictates of justice and fairness." (citation omitted) (internal quotation marks omitted)).  Second,

> government regulation—by definition—involves the adjustment of rights for the public good.  Often this adjustment curtails some potential for the use or economic exploitation of private property.  To require compensation in all such circumstances would effectively compel the government to regulate by purchase.  "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."

*Andrus*, 444 U.S. at 65 (quoting *Mahon*, 260 U.S. at 413).

Applying those principles, the Supreme Court has carved out two relatively narrow categories of regulatory takings that always require compensation, neither of which is implicated here.[18]  Other than those narrow categories, however, regulatory takings challenges are generally governed by the balancing test set forth in *Penn Central*.  *Lingle*, 544 U.S. at 538; *Palazzolo*, 533 U.S. at 617.  That test requires consideration of three factors: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 137 S. Ct. at 1943; *Penn Cent.*, 438 U.S. at 124; *see also Palazzolo*, 533 U.S. at 633 (O'Connor, J., concurring) (characterizing the *Penn Central* test as the polestar for regulatory takings).  The Supreme Court has described the *Penn Central* test as an "essentially ad hoc, factual inquir[y]" amounting to a "complex factual assessment[] of the purposes and economic effects of government action[]" that "depends largely upon the particular circumstances in that case." *Tahoe-Sierra*

---

[18] *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) (holding a government regulation that requires a property owner suffer a permanent physical invasion of his property, however minor, will require just compensation); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) (finding a regulation that completely deprives a property owner of all economically beneficial use of his property amounts to a compensable taking).

*Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 323, 326 (2002) (internal alteration and quotation marks omitted) (first quoting *Penn Cent.*, 438 U.S. at 124; then quoting *Yee v. Escondido*, 503 U.S. 519, 523 (1992); and then quoting *Penn Cent.*, 438 U.S. at 124).

It bears repeating that, because *Penn Central* is a balancing test, "[t]here is no abstract or fixed point at which judicial intervention under the Takings Clause becomes appropriate. . . . Resolution of each case . . . ultimately calls as much for the exercise of judgment as for the application of logic." *Andrus*, 444 U.S. at 65; *see also Murr*, 137 S. Ct. at 1943 ("A central dynamic of the Court's regulatory takings jurisprudence, then, is its flexibility. This has been and remains a means to reconcile two competing objectives central to regulatory takings doctrine. One is the individual's right to retain the interests and exercise the freedoms at the core of private property ownership. . . . The other persisting interest is the government's well-established power to adjust rights for the public good. . . . In all instances, the analysis must be driven by the purpose of the Takings Clause, which is to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." (cleaned up)).

### A.

"Before determining whether a taking has occurred, a court must first determine what, precisely, is the property at issue." *Dunes W. Golf Club*, 401 S.C. at 305, 737 S.E.2d at 614. "The definition of the relevant parcel profoundly influences the outcome of a takings analysis." *Dist. Intown Props. v. Dist. of Columbia*, 198 F.3d 874, 880 (D.C. Cir. 1999). Because a takings analysis requires a court to compare the value that has been taken from the property with the value remaining in the property, one of the most critical steps is determining how to define the unit of property whose value supplies the denominator of the takings fraction. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987); *Palazzolo*, 533 U.S. at 631 (describing the determination of the denominator in the takings fraction as a "difficult, persisting question"). In essence, the question is whether a court must consider a regulation's impact on only part of the property or on the whole parcel. *Dunes W. Golf Club*, 401 S.C. at 306, 737 S.E.2d at 615.

In the past, the Supreme Court oftentimes—but not always—found the denominator in the takings fraction amounted to the entire property, and not merely the part "taken" or interfered with by the government regulation. *See, e.g., Penn*

*Cent.*, 438 U.S. at 130–31 ("'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses . . . [on] the parcel as a whole . . . ."); *Tahoe-Sierra Pres. Council*, 535 U.S. at 331 ("Of course, defining the property interest taken in terms of the very regulation being challenged is circular."). More recently, in *Murr v. Wisconsin* the United States Supreme Court set forth a new, more nuanced multifactor test to define the relevant parcel. 137 S. Ct. at 1945–46 (applying the new test to two contiguous properties affected by a merger ordinance).

"First, courts should give substantial weight to the treatment of the land, in particular how it is bounded or divided, under state and local law." *Id.* at 1945. Second, courts should consider the physical characteristics of the property, including "the surrounding human and ecological environment." *Id.* As to this second factor, it may be particularly relevant whether "the property is located in an area that is subject to, or likely to become subject to, environmental or other regulation." *Id.* at 1945–46 (citing *Lucas*, 505 U.S. at 1035 (Kennedy, J., concurring) ("Coastal property may present such unique concerns for a fragile land system that the State can go further in regulating its development and use than the common law of nuisance might otherwise permit.")). Third and finally,

> courts should assess the value of the property under the challenged regulation, with special attention to the effect of burdened land on the value of other holdings. Though a use restriction may decrease the market value of the property, the effect may be tempered if the regulated land adds value to the remaining property, such as by increasing privacy, expanding recreational space, or preserving surrounding natural beauty. . . . [I]f the landowner's other property is adjacent to the small lot, the market value of the properties may well increase if their combination enables the expansion of a structure, or if development restraints for one part of the parcel protect the unobstructed skyline views of another part. That, in turn, may counsel in favor of treatment as a single parcel and may reveal the weakness of a regulatory takings challenge to the law.

*Murr*, 137 S. Ct. at 1946; *see also Dunes W. Golf Club*, 401 S.C. at 309 n.17, 737 S.E.2d at 616 n.17 (explaining the "extent of contiguous commonly-owned

property gives rise to a rebuttable presumption defining the relevant parcel," and stating the court may consider "various factors including whether the property is divided by a road; whether the property was acquired at the same time; whether the purchase and financing of parcels were linked; the timing of development; whether the land is put to the same use or different uses; whether the owner intended to or actually did use the property as one economic unit; and the treatment of the property under state law") (quoting *Giovanella v. Conserv. Comm'n of Ashland*, 857 N.E.2d 451, 457–58 (Mass. 2006))).

Here, we find the *Murr* factors weigh in favor of identifying the relevant parcel as Lots A and B combined. *See Quinn v. Bd. of Cnty. Comm'rs*, 862 F.3d 433, 441 (4th Cir. 2017) ("The multifactor standard established by the Supreme Court's decision in *Murr* suggests that the lots subject to merger should be viewed as a collective.").

As to the first *Murr* factor (the treatment of the land), Lots A and B are currently merged under state and local law, and there are no physical or topographical boundaries that would limit joint treatment or development of the Lots. *See Quinn*, 862 F.3d at 441; *Dunes W. Golf Club*, 401 S.C. at 309 n.17, 737 S.E.2d at 616 n.17 (citing *Giovanella*, 857 N.E.2d at 457–58). In fact, the Lots have always been owned and sold as a single unit and were even redeveloped by Braden's Folly at the same time. *See Dunes W. Golf Club*, 401 S.C. at 309 n.17, 737 S.E.2d at 616 n.17 (citing *Giovanella*, 857 N.E.2d at 457–58). Likewise, due to both the zoning ordinances and the DMA, Braden's Folly is prohibited from selling the Lots separately or from building separate homes on each should one of the existing homes be more than 50% destroyed. *See Murr*, 137 S. Ct. at 1948.

Furthermore, with respect to the second *Murr* factor (the property's physical characteristics), the Lots are located on the beach, a quintessential example of an area that is heavily regulated and likely to become subject to additional environmental regulations. *See Lucas*, 505 U.S. at 1035 (Kennedy, J., concurring).

Finally, turning to the third *Murr* factor (the value of the property), "the prospective value that Lot [A] brings to Lot [B] supports considering the two as one parcel for purposes of determining if there is a regulatory taking." *Murr*, 137 S. Ct. at 1948. As it currently stands, and regardless of the impact of the merger ordinance, Lot B is restricted by Folly Beach's DMA. As a result, should the house on Lot B be destroyed by 50% or more, the DMA would prevent any

redevelopment on that lot.  The merger of Lots A and B would allow the property owner to maintain a beach house on at least one of the lots—Lot A—while simultaneously enjoying the unparalleled beach access of Lot B.  Moreover, any economic impact resulting from the merger ordinance "is mitigated by the benefits of using the property as an integrated whole, allowing increased privacy and recreational space, plus the optimal location of any improvements."  *Id.*  Allowing only one house to be built on the two combined lots could increase the market value of the Lots as well because it would allow for the expansion of the existing Lot A house, and it ensures unobstructed ocean views for that single, larger house (rather than Lot A having little to no ocean view due to the existence of the home on Lot B).  *Id.* at 1946.

As a result, we hold the appropriate denominator in the takings fraction, and the appropriate parcel to compare any economic impact resulting from the merger ordinance, is the entirety of Lots A and B combined.

**B.**

Equally important to defining the relevant parcel, we recognize that the unique legal landscape surrounding beach management regulation in Folly Beach must underlie our analysis of the *Penn Central* factors and inform our determination of what is "just and fair" in this situation.  As discussed above, the extreme erosion in Folly Beach has caused it to receive unparalleled discretion to promulgate its own beachfront management regulations, including those dealing with setback requirements and erosion control barriers.  The legal exemptions Folly Beach is afforded by the state's Beachfront Management Act create an unusual situation that leaves a locality—rather than the state or federal government—as the primary entity in charge of establishing policies to protect the beach and public trust, including prohibiting beachfront development.  Of course, the same locality also has competing interests, such as fostering local beachfront development, drawing in tourism via rental properties, and increasing the local tax base.

It is clear Folly Beach weighed those competing interests differently in the past.  Two decades ago, Folly Beach prioritized growth and development.  Now, however, it appears Folly Beach believes that allowing development of the super-beachfront lots causes a nuisance to nearby property owners, whose lots are eroded even more than the nine-feet-per-year average due to the seawalls in front of the neighboring super-beachfront properties.  Moreover, in recent years, Folly Beach

has pursued policies reflecting its view that super-beachfront development risks the livelihood of the entire community via the potential destruction of the beach (if there is no renourishment) or levying a significant, unpopular tax assessment on locals (if forced to pay for the renourishment itself).

Given the uniqueness of letting a locality control its own beach management, we find some discretion must be allowed to the locality to review and unwind decisions that it later realizes were unwise. *Cf. Esposito v. S.C. Coastal Council*, 939 F.2d 165, 169 (4th Cir. 1991) (explaining that establishing a policy of withdrawal from building seaward of a setback line in an effort to address beachfront erosion is a decision "in which . . . legislatures who deal with the situation from a practical standpoint[] are better qualified than the courts to determine the necessity, character[,] and degree of regulation which these new and perplexing conditions require" (internal alteration and quotation marks omitted) (quoting *Gorieb v. Fox*, 274 U.S. 603, 608 (1927))); *Lucas*, 505 U.S. at 1035 (Kennedy, J., concurring) (noting that coastal property in particular presents unique concerns for a fragile land system, and that those unique concerns may allow the regulating authority to "go further in regulating [beach properties'] development and use than the common law of nuisance might otherwise permit"). Borrowing from Justice Kennedy's sound rationale, the unique concerns facing the beach and coastline at Folly Beach may allow the city to "go further" in regulating super-beachfront development than the law might otherwise permit.

Of equal importance, the merger ordinance is only one of several tools Folly Beach has employed to push back super-beachfront development. In particular, the creation of the DMA must impact our analysis, as—wholly separate from the merger ordinance—development is now prohibited in Folly Beach within forty feet of the perpetual easement line. Thus, regardless of our decision on the constitutionality of the merger ordinance, Braden's Folly cannot redevelop Lot B in the event it is ever destroyed more than 50% of its current value because Lot B is located almost entirely within the DMA. The DMA is but one example of Folly Beach's attempts to ensure the continuing availability of federal funding to rebuild the beach.

The benefits resulting from periodic beach renourishment not only impact the public as a whole, but Braden's Folly in particular. According to the ACOE, absent the ongoing beach renourishment projects, the erosion in Folly Beach would have swept away not only the entirety of the B lots by now, *but also the entirety of the A*

*lots on East Ashley Avenue as well.*[19]  If federal funding is lost due to super-beachfront development, and Folly Beach is unable to secure enough local funds to itself pay for the renourishment projects, all of the houses on the northeast end of Folly Beach—including both of Braden's Folly's Lots—will be underwater in the next two to three decades.

Keeping Folly Beach's unique legal landscape in mind, we turn to the *Penn Central* test.

## C.

The first *Penn Central* factor is the economic impact of the merger ordinance on Braden's Folly.

The United States Supreme Court has uniformly rejected the proposition that a diminution in property value, standing alone, can establish a taking.  *Penn Cent.*, 438 U.S. at 131; *Andrus*, 444 U.S. at 66; *Dunes W. Golf Club*, 401 S.C. at 317–18, 737 S.E.2d at 621.  Rather, the Supreme Court has advised that courts must focus "on the uses the regulations permit." *Penn Cent.*, 438 U.S. at 131; *Dunes W. Golf Club*, 401 S.C. at 317–18, 737 S.E.2d at 621.  Likewise, while a comparison of property values before and after the regulation is relevant, "it is by no means conclusive." *Keystone Bituminous*, 480 U.S. at 490 (quoting *Goldblatt v. Hempstead*, 369 U.S. 590, 594 (1962)).  "The extent of diminution in value is but one fact for consideration in determining whether governmental action constitutes a taking." *Dunes W. Golf Club*, 401 S.C. at 317, 737 S.E.2d at 621 (cleaned up) (citation omitted).

Here, an appraisal report commissioned by Braden's Folly found that if Lots A and B were sold separately, they were worth $508,000 more than if they were sold as a

---

[19] We specifically reference an ACOE map in the record showing that, absent any of the federally-funded beach renourishments (which started in the 1990s), the ACOE estimates the location of the mean highwater line would be in the middle of East Ashley Avenue—a staggering impact on local property owners that would result from only thirty years of unchecked erosion on Folly Beach.  It may be important to recall that the ACOE does not provide federally-funded beach renourishment behind the perpetual easement line, thereby imposing all costs to restore those areas on the city and the property owners.

single, merged lot.  Thus, Braden's Folly asserts it has lost the opportunity to obtain $508,000 in future profits.  While we take issue with the appraiser's calculations,[20] we will assume for the purposes of discussion that they are accurate, and the appraiser correctly calculated the value of the Lots merged together as $2.2 million.  Thus, using the takings fraction, Braden's Folly is asserting a 23% economic impact due to the merger ordinance:

$$\frac{\text{Value of property taken (Numerator)}}{\text{Value of relevant parcel (Denominator)}} = \frac{\$508,000}{\$2,200,000} = 23\%$$

While not insignificant, a 23% reduction in value is far less than other reductions in value found constitutional by the Supreme Court.  *E.g.*, *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926) (75% diminution in value not a taking); *Hadacheck v. Sebastian*, 239 U.S. 394 (1915) (87.5% diminution in value not a taking).

Notably, the Supreme Court has considered a number of takings cases in which a loss of an opportunity to make future profits was at issue.  *See, e.g.*, *Andrus*, 444 U.S. at 54, 66 (dealing with a prohibition on the sale of certain bird artifacts); *Mahon*, 260 U.S. at 412–13, 414–15 (involving a regulation prohibiting the

---

[20] We find any reliance on the appraiser's report is questionable at best.  For example, although there are also other areas of concern, the values of the Lots merged and separate were calculated using different methods, making any comparison between the results akin to comparing apples to oranges.  Specifically, in finding a $508,000 difference between the Lots value if sold separately as compared to merged into a single property, the appraiser compared the *gross* proceeds of the Lots sold separately with the *net* proceeds of the Lots sold as a single unit.  In comparing net proceeds to net proceeds, the difference in values of the Lots merged and separate is around $64,000—a negligible diminution in value of around 3%.  *See Murr*, 137 S. Ct. at 1949 ("The expert appraisal relied upon by the state courts refutes any claim that the economic impact of the regulation is severe.").

removal of coal from underground if it would cause subsidence of human habitations aboveground). In those two cases, the Supreme Court found the key distinction was whether a regulation physically restricted the property at issue: *Mahon* involved a loss of profit opportunity accompanied by a physical restriction against the removal of the coal, whereas *Andrus* involved a loss of profit opportunity that was not accompanied by a physical restriction of the property. *See Andrus*, 444 U.S. at 65–66 & n.22 (distinguishing *Mahon*). As explained by the *Andrus* Court,

> The regulations challenged here do not compel the surrender of the artifacts, and there is no physical invasion or restraint upon them. Rather, *a significant restriction has been imposed on one means of disposing of the artifacts*. But the denial of one traditional property right does not always amount to a taking. *At least where an owner possesses a full "bundle" of property rights, the destruction of one "strand" of the bundle is not a taking, because the aggregate must be viewed in its entirety*. In this case, it is crucial that appellees retain the rights to possess and transport their property, and to donate or devise the protected birds [and bird artifacts].

> It is, to be sure, undeniable that the regulations here prevent the most profitable use of appellees' property. Again, however, that is not dispositive. When we review regulation, a reduction in the value of property is not necessarily equated with a taking. In the instant case, it is not clear that appellees will be unable to derive economic benefit from the artifacts; for example, they might exhibit the artifacts for an admissions charge. *At any rate, loss of future profits— unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim.* Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform. Further, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests.

444 U.S. at 65–66 (emphasis added) (internal citations omitted). Here, the merger ordinance is not accompanied by any physical restriction on the Lots.

Moreover, as Folly Beach has repeatedly conceded, even under the merger ordinance, Braden's Folly remains able to rent out the houses on the Lots separately and continue bringing in revenue, with the average gross receipts for the Lots amounting to approximately $117,000 per year. *See Penn Cent.*, 438 U.S. at 131 (stating courts should focus "on the uses the regulations permit," rather than what is not permitted); *Dunes W. Golf Club*, 401 S.C. at 317–18, 737 S.E.2d at 621 (same); *cf. Murr*, 137 S. Ct. at 1949 ("They can use the property for residential purposes, including an enhanced, larger residential improvement."); *Palazzolo*, 533 U.S. at 631 ("A regulation permitting a landowner to build a substantial residence on an 18-acre parcel does not leave the property 'economically idle.'" (citation omitted)); *Quinn*, 862 F.3d at 442 ("Quinn can still build homes on his land; the [Merger] Provision only requires that the development be less dense than he had hoped."); *Beard v. S.C. Coastal Council*, 304 S.C. 205, 208, 403 S.E.2d 620, 622 (1991) (finding a setback provision did not effect a taking in part because the property owners could still sell the property and utilize the rental units on the property).

Finally, it is legally significant that, during the pendency of this lawsuit, Bonner—a buyer who was unquestionably aware of the amended merger ordinance and its impact on the Lots—offered Braden's Folly its full asking price of $2.55 million for both Lots. Bonner diligently pursued the sale, emailing and calling Braden's Folly daily for several weeks but receiving no response to his inquiries or full-priced offer. Given those facts, it is absurd to suggest the merger ordinance had an unconstitutionally negative economic impact on the Lots. After all, Braden's Folly was offered its full asking price for the Lots. It simply chose not to accept that offer, perhaps due to its realtor's advice to continue marketing the Lots solely to "go after the city. You might get your money and not have to sell."

For all of these reasons, it is our opinion the economic impact factor weighs heavily in favor of finding there has been no compensable taking.

## D.

We next turn to the second *Penn Central* factor: the extent to which the merger ordinance interfered with Braden's Folly's investment-backed expectations.

"In evaluating a regulatory takings claim, the purpose of consider[ing] . . . investment-backed expectations is to limit recoveries to property owners who can

demonstrate that they [invested in] their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Columbia Venture, L.L.C. v. Richland Cnty.*, 413 S.C. 423, 449, 776 S.E.2d 900, 914 (2015) (internal alteration and quotation marks omitted) (citation omitted). "A reasonable investment-backed expectation must be more than a unilateral expectation or an abstract need." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980)) (internal quotation marks omitted); *Penn Cent.*, 438 U.S. at 130 ("[T]he submission that [a property owner] may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable."). Rather, courts will evaluate a property owner's reasonable, investment-backed expectations through an objective lens. *Dunes W. Golf Club*, 401 S.C. at 320, 737 S.E.2d at 622; *Columbia Venture*, 413 S.C. at 449, 776 S.E.2d at 914 ("The subjective expectations of the claimant are irrelevant. The critical question is what a reasonable owner in the claimant's position should have anticipated." (internal alteration marks omitted) (quoting *Chancellor Manor v. United States*, 331 F.3d 891, 904 (Fed. Cir. 2003)) (internal citation omitted)).

For example, courts in the past have looked to a number of objective factors, including: (1) whether the challenged regulation interferes with the existing use of the property;[21] (2) the degree to which the property's general locale is subject to

---

[21] *Penn Cent.*, 438 U.S. at 136 (noting the regulation at issue did not interfere with the present use of the property: "[The property's] designation as a landmark not only permits but contemplates that appellants may continue to use the property precisely as it has been used for the past 65 years . . . . So the law does not interfere with what must be regarded as Penn Central's primary expectation concerning the use of the parcel."); *Esposito*, 939 F.2d at 170 ("[W]e note that the courts have traditionally looked to the existing use of property as a basis for determining the extent of interference with the owner's primary expectation concerning the use of the parcel. We find that the Act permitted the . . . plaintiffs to continue their existing use of their property and dwellings in the same manner that they could have used the property prior to its enactment. The plaintiffs, in fact, have stipulated that 'none of the Plaintiffs . . . have discontinued use of their property, as it was used before enactment of the subject Statutes.' They continued to retain the fundamental incidents of ownership, including the right to possess the

regulation;[22] and (3) whether the property owner acquired the land after the regulation went into effect.[23]  Likewise, in cases involving merger ordinances,

property, exclude others from it, alienate the property and continue to use it for residential and recreational purposes; and *they were significantly diminished only in their discretion to rebuild a structure in the speculative event of its virtually complete destruction*." (emphasis added) (cleaned up)); *Carolina Chloride*, 394 S.C. at 173, 714 S.E.2d at 878 (stating that "continuation of the existing use of the property is the property owner's primary expectation when considering an owner's investment-backed expectations for the property" (quoting *Byrd*, 365 S.C. at 662, 620 S.E.2d at 82) (internal quotation marks omitted)); *Dunes W. Golf Club*, 401 S.C. at 319, 737 S.E.2d at 622 (finding the fact that the property had always been used as a golf course necessarily meant the owner's primary expectation was to continue using the property as a golf course, not to build houses on the land).

[22] *Lucas*, 505 U.S. at 1035 (Kennedy, J., concurring) (stating coastal property engenders a greater degree of concern due to the fragile ecosystem, and therefore the State may be permitted to go further in regulating development and use than in other types of environments); *Murr*, 137 S. Ct. at 1948 ("The land's location along the river is also significant.  Petitioners could have anticipated public regulation might affect their enjoyment of their property, as the Lower St. Croix was a regulated area under federal, state, and local law long before petitioners possessed the land."); *Columbia Venture*, 413 S.C. at 449, 776 S.E.2d at 914 ("In examining the reasonable expectations prong, the level of industry regulation is a pertinent but not determinative factor." (quoting *Chancellor Manor*, 331 F.3d at 906) (internal quotation marks omitted)); *Dunes W. Golf Club*, 401 S.C. at 319, 737 S.E.2d at 622 (finding the property owner's expectations were unreasonable in part because they "did not take into account the wetlands, easements, or substantial changes to the [property] that would be required" to bring those expectations to fruition); *cf. Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993) ("Those who do business in [a] regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.") (citation omitted)).

[23] *Palazzolo*, 533 U.S. at 633, 634 (O'Connor, J., concurring) ("Further, the regulatory regime in place at the time the claimant [invests in] the property at issue helps to shape the reasonableness of those expectations. . . .  For example, the

courts may also find objective indicia of a property owner's investment-backed expectations by examining the sizes and shapes of the properties to be merged. *Cf. Murr*, 137 S. Ct. at 1948 (noting it was reasonable to treat two adjacent lots as merged because they were contiguous along their longest edge, and their narrow shape and topography made it "reasonable to expect their range of potential uses might be limited").

Here, there is some objective evidence that Braden's Folly's investment-backed expectation in developing Lot B was to sell one of its Lots separately from the other. Braden's Folly invested in its Lots in 2006 and 2007 when it redeveloped the house on Lot A and built a new super-beachfront house on Lot B.[24] At that

---

nature and extent of permitted development under the regulatory regime vis-à-vis the development sought by the claimant may also shape legitimate expectations without vesting any kind of development right in the property owner."); *Murr*, 137 S. Ct. at 1949 ("Petitioners cannot claim that they reasonably expected to sell or develop their lots separately given the regulations which predated their acquisition of both lots."); *Columbia Venture*, 413 S.C. at 449, 776 S.E.2d at 914 (explaining a property owner's reasonable investment-backed expectations are defined at the time he makes the relevant investment in the property, and any regulatory regime in place at that time informs the scope of those expectations; but also stating that while "timing and sequence are quite probative and material to [the] analysis, . . . they are simply not dispositive" (citations omitted)).

[24] There is language in one of our prior cases that could indicate a property owner's investment-backed expectations are defined only at the time he purchases the property. *See, e.g.*, *Columbia Venture*, 413 S.C. at 449, 776 S.E.2d at 914 ("A property owner's reasonable investment-backed expectations are defined at the time the property is purchased." (quoting *Norman v. United States*, 63 Fed. Cl. 231, 267 (2004))). However, that language should not be read out of context: in that case, the owner's investment in the property was made when he purchased the property. Here, the relevant investment was made in the property when Braden's Folly redeveloped the land. In other words, investment-backed expectations are set at the time the property owner actually invests in the property, for example, at the time he purchases it or at some other future point in time. However, as we explain below, the reasonableness of those expectations may be impacted by future events occurring after the time the investment is made.

time, the merger ordinance did not exist, and property owners along East Ashley Avenue freely developed and sold their A and B lots independently from one another. Objectively, it would have been reasonable for Braden's Folly to have expected to be able to do the same. *See Murr*, 137 S. Ct. at 1949; *Palazzolo*, 533 U.S. at 633, 634 (O'Connor, J., concurring); *Columbia Venture*, 413 S.C. at 449, 776 S.E.2d at 914.[25] Additionally, Braden's Folly attempted to set up a complicated system of easements between Lots A and B to ensure both properties had road and beach access as well as room for a septic system. There would have been no reason for Braden's Folly to establish the easements if it did not intend to sell one of the Lots.

However, there are also a number of objective factors that weigh against finding Braden's Folly's reasonable, investment-backed expectation was solely to be able to sell the Lots separately from one another. First, Braden's Folly has used these Lots for family vacations and as rental properties for several decades. The "primary expectation" would seemingly be to continue those uses—something with which the merger ordinance does not interfere. *See Penn Cent.*, 438 U.S. at 136; *Esposito*, 939 F.2d at 170; *Dunes W. Golf Club*, 401 S.C. at 319, 737 S.E.2d at 622; *Carolina Chloride*, 394 S.C. at 173, 714 S.E.2d at 878.

Second, we find significant Braden's Folly's delay in attempting to sell the Lots after their redevelopment. As explained above, the housing market collapsed around the time construction on the Lots was completed, which made selling one of the Lots financially unfeasible for several years. However, once the market recovered, Braden's Folly waited many years to put the Lots on the market, continuing to use them both as family vacation homes and rental properties. Moreover, even after the houses were placed on the market, Braden's Folly made little to no effort to actually sell either property.[26] While Braden's Folly may have

---

[25] Likewise, Folly Beach affirmatively issued building permits for super-beachfront construction, which could have increased Braden's Folly's expectation that developing Lot B was reasonable. *But cf. Palazzolo*, 533 U.S. at 633, 634 (O'Connor, J., concurring) ("[T]he nature and extent of permitted development under the regulatory regime vis-à-vis the development sought by the claimant may also shape legitimate expectations *without vesting any kind of development right in the property owner*." (emphasis added)).

[26] For example, although the houses were continuously listed for nearly three years

initially intended to sell one of the Lots following construction, that expectation apparently changed over time.[27]

Third, even assuming Braden's Folly's investment-backed expectation remained the same, the government cannot be held hostage by a property owner's expectations indefinitely when an owner refuses to implement those expectations. Rather, at some point, the government must have a right to regulate local properties in a measured fashion without running afoul of the takings doctrine, even if its regulation runs contrary to an owner's unspoken and unimplemented investment-backed expectations. *See Columbia Venture*, 413 S.C. at 449, 776 S.E.2d at 914 (explaining the property owner's subjective expectations and efforts to implement those expectations are irrelevant, and courts must instead focus on what a reasonable, similarly situated property owner should have anticipated (quoting *Chancellor Manor*, 331 F.3d at 904)).

This is particularly true when, as here, the government regulation affects properties in a dynamic, fragile environment. Coastal areas are some of the most heavily regulated areas in the state due to their inherent vulnerability and volatility.

---

beginning in February 2018, Braden's Folly received only two offers over the first two-and-a-half years—one in August 2019, and one in October 2020. Nonetheless, Braden's Folly never lowered the listing prices for the Lots, instead raising the listing price for Lot B by $500,000 in December 2020.

[27] At three different places in the record, one of the Braden brothers testified specifically about the changed expectation regarding the Lots, stating:

(1) "Eventually, the real estate market rebounded and offers were available for us to sell *but we decided to continue renting and vacationing at the houses instead*." (Emphasis added).

(2) "[I]t was our intention to own one and sell one. When that didn't happen, then we went into rental, and that then kind of became sort of the combination of usage, where it was personal and rental, and it sort of bounced up and down based upon the different ages of [our] children and the locations of [our family members]."

(3) "There was a lot of family resistance [to selling the Lots]."

Nonetheless, at the time Lot B was developed and Braden's Folly initially formulated its investment-backed expectation, Folly Beach had enacted little to no regulations protecting the beach from over-development, including setback requirements or prohibitions on seawalls. In terms of beach regulation, Folly Beach was an outlier compared to surrounding coastal towns.

Over a decade later, when Braden's Folly half-heartedly attempted to actually implement its purported investment-backed expectation and placed the Lots on the market, there had been a number of events that impacted the reasonableness of Braden's Folly's initial expectation. More specifically, the need for regulation in Folly Beach's coastal areas had become evident. The frequency of large-scale beach renourishments steadily increased due to the super-beachfront development, objectively indicating that development was not sustainable. Of more concern, the super-beachfront houses and their seawalls created a public nuisance via the blue blob areas. Once it became apparent that the developed B lots were the source of these flooded areas, it likewise became objectively unreasonable for Braden's Folly to expect to own Lot B with no restrictions or regulations impacting its ownership, including its ability to alienate the property in whatever manner it chose. While it is true the unreasonableness of Braden's Folly's expectations did not fully manifest until after it invested in the redevelopment of the Lots, we harken back to Braden's Folly's inexplicable delay in implementing its investment-backed expectation. That delay was entirely within Braden's Folly's control. We find it objectively unreasonable for Braden's Folly to see the creation and worsening of a public nuisance created by super-beachfront development and *not* expect the city to regulate in some fashion to attempt to fix the problem. *See Lucas*, 505 U.S. at 1035 (Kennedy, J., concurring) ("I agree with the Court that nuisance prevention accords with the most common expectations of property owners who face regulation . . . ."); *Quinn*, 862 F.3d at 442 (holding a merger ordinance did not constitute an unconstitutional taking even though it interfered with the owner's investment-backed expectations to develop the affected properties; explaining the owner could still implement his expectations, just in a less dense manner than he had initially envisioned).

Fourth, we find the purported creation of easements between Lots A and B does not weigh heavily in favor of Braden's Folly's investment-backed expectation. As briefly alluded to in note 15, *supra*, the easements were created when "Mark Braden granted *himself*" the rights to beach access for Lot A and road access and

septic lines for Lot B. (Emphasis added.) However, Braden's Folly could not create those easements while owning both the dominant and servient estates, so the easements do not legally exist. *Windham v. Riddle*, 370 S.C. 415, 419, 635 S.E.2d 558, 560 (Ct. App. 2006) (explaining an easement cannot exist where both the purported servient and dominant estates are owned by the same person (citing *Haselden v. Schein*, 167 S.C. 534, 539, 166 S.E. 634, 635 (1932))), *aff'd*, 381 S.C. 192, 672 S.E.2d 578 (2009); *cf.* 12 S.C. Jur. *Easements* § 32 (Sept. 2022 Update) ("Courts generally have held that upon acquisition of the dominant tenement and the servient tenement by the same person at the same time, an easement is extinguished by merger."). Thus, while Braden's Folly argues the attempt to create the easements showed its investment-backed expectation to separately sell the Lots, because the easements do not exist, their attempted creation does not impact this factor of the *Penn Central* test or cause this factor to weigh in favor of Braden's Folly.

Fifth and finally, the size, shape, and orientation of the Lots provides objective indicia that Braden's Folly's expectation to develop and sell Lot B was unreasonable. Specifically, most of Lot B is subject to the perpetual easement for renourishment, leaving a very small footprint in which a house could be built, far below the minimum lot size requirement in Folly Beach's zoning ordinances. However, Lot B is contiguous with another undersized (albeit slightly larger) parcel—Lot A—owned by the same entity. Combining the two Lots makes a single "normal" sized lot that many other property owners living on East Ashley Avenue have used to develop one single-family home. Thus, the small size of the Lots provides some objective evidence that Braden's Folly's intent to develop and sell a separate single-family residence was objectively unreasonable. *See Murr*, 137 S. Ct. at 1948; *see also id.* at 1947 ("[L]ot lines are themselves creatures of state law, which can be overridden by the State in the reasonable exercise of its power.").

Accordingly, in sum, there are some facts that weigh in favor of finding Braden's Folly's investment-backed expectation was reasonable and some that weigh in favor of finding its expectation was unreasonable. We therefore find this factor of the *Penn Central* balancing test does not weigh in favor of either party. *See Palazzolo*, 533 U.S. at 634, 635 (O'Connor, J., concurring) (explaining that "[I]nvestment-backed expectations, though important, are not talismanic under *Penn Central*"; and counseling against giving investment-backed expectations

"exclusive significance" lest the State wield too much power, or the property owner "reap windfalls and an important indicium of fairness is lost"); *Columbia Venture*, 413 S.C. at 454, 776 S.E.2d at 917 ("[D]eveloping real estate carries with it certain financial risks, and it is not the government's duty to underwrite this risk as an extension of obligations under the takings clause." (quoting *Taub v. City of Deer Park*, 882 S.W.2d 824, 826 (Tex. 1994))).

## E.

Finally, we turn to the third *Penn Central* factor and analyze the character of the government action, specifically, whether Folly Beach's merger ordinance is akin to an eminent domain action.

Regulatory takings cases "aim[] to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539. A regulation will be more readily found to amount to an unconstitutional taking if it causes "private property [to be] pressed into some form of public service under the guise of mitigating serious public harm." *Lucas*, 505 U.S. at 1018; *Penn Cent.*, 438 U.S. at 124. However, if the regulation is merely a "public program adjusting the benefits and burdens of economic life to promote the common good," the regulation will pass constitutional muster. *Penn Cent.*, 438 U.S. at 124, 125 (stating that "[z]oning law[s] are, of course, the classic example" of such a public program). It therefore becomes important for a court to consider "the magnitude or character of the burden a particular regulation imposes upon private property rights" as well as "how any regulatory burden is distributed among property owners." *Lingle*, 544 U.S. at 542 (emphasis omitted) ("In answering [the takings] question, we must remain cognizant that 'government regulation—by definition—involves the adjustment of rights for the public good . . . .'" (quoting *Andrus*, 444 U.S. at 65)); *see also Penn Cent.*, 438 U.S. at 133 ("Legislation designed to promote the general welfare commonly burdens some more than others.").

In *Murr*, the Supreme Court discussed the character of merger ordinances extensively, stating:

> The merger provision here is likewise a legitimate exercise of
> government power, as reflected by its consistency with a long history
> of state and local merger regulations that originated nearly a century

ago. Merger provisions often form part of a regulatory scheme that establishes a minimum lot size in order to preserve open space while still allowing orderly development.

When States or localities first set a minimum lot size, there often are existing lots that do not meet the new requirements, and so local governments will strive to reduce substandard lots in a gradual manner. The regulations here represent a classic way of doing this: by implementing a merger provision, which combines contiguous substandard lots under common ownership, alongside a grandfather clause, which preserves adjacent substandard lots that are in separate ownership. Also, as here, the harshness of a merger provision may be ameliorated by the availability of a variance from the local zoning authority for landowners in special circumstances.

Petitioners' insistence that lot lines define the relevant parcel ignores the well-settled reliance on the merger provision as a common means of balancing the legitimate goals of regulation with the reasonable expectations of landowners. Petitioners' rule would frustrate municipalities' ability to implement minimum lot size regulations by casting doubt on the many merger provisions that exist nationwide today.

. . . .

. . . Finally, the [character of the] governmental action [(i.e., the merger ordinance)] was a reasonable land-use regulation, enacted as part of a coordinated federal, state, and local effort to preserve the river and surrounding land.

137 S. Ct. at 1947–48, 1949–50 (internal citations omitted); *see also Quinn*, 862 F.3d at 441, 443, 445 (reaching a similar holding for similar reasons: "Local governments require flexibility to expand services like sewer in response to community needs; those governments also must be able to control the density of development in order to prevent overcrowding in schools, clogging of streets, overload on sewer facilities, degradation of the environment, and a host of other concerns. As recognized in *Murr*, adding a highly dubious constitutional overlay

to the already complex mixture of legal requirements risks making land use planning a well-nigh impossible undertaking.").

Here, Folly Beach's merger ordinance does not unfairly single out Braden's Folly's Lots. Rather, as discussed by the *Murr* Court, merger ordinances have long been employed as a tool to regulate lot sizes. Like in *Murr*, the merger ordinance here is "a reasonable land-use regulation, enacted as part of a coordinated . . . effort to preserve the [beach] and surrounding land." 137 S. Ct. at 1949–50.[28]

While Braden's Folly was slightly burdened by the merger ordinance, it in turn will "benefit greatly from the restrictions that are placed on others." *Keystone Bituminous*, 480 U.S. at 491. Folly Beach and its witnesses set forth in detail the advantages to local beachfront property owners and the public at large should the city unwind the super-beachfront development. The most important of the benefits to local property owners is the continued existence of federal funding for beach renourishment, which in turn (1) protects the A and B lots—particularly given that *all* of the lots would be underwater at this point if it were not for the continual beach renourishment; and (2) avoids property owners paying higher taxes if federal funding is extinguished and Folly Beach must pay for the renourishments with local funds alone.

Accordingly, we find the character of the merger ordinance is not akin to a classic eminent domain action. Rather, in light of the potential public costs of continuing unchecked super-beachfront development, we reject the argument that Folly Beach's merger ordinance constitutes anything but responsible land use policy— one that is generally applicable and widely accepted nationwide. *See, e.g.*, *Murr*, 137 S. Ct. at 1949–50; *Quinn*, 862 F.3d at 443. We thus hold this factor of the

---

[28] We find it significant that the quote in the preceding sentence is the entirety of the *Murr* Court's analysis of this *Penn Central* factor: the Supreme Court was so dismissive of the possibility that a merger ordinance could enact a taking that it addressed the character of the government action in a single sentence in its opinion. That cursory analysis speaks volumes as to the strength of its finding as to this factor of the *Penn Central* test.

*Penn Central* test weighs in favor of finding the merger ordinance did not effect a taking of the Lots.

## F.

After applying the *Penn Central* test, we find two factors weigh strongly in favor of Folly Beach: the economic impact and the character of the government action. As to the third factor, we find there is competing evidence regarding whether the merger ordinance interfered with Braden's Folly's reasonable, investment-backed expectation. We therefore conclude the third factor is a neutral factor that does not weigh in favor of either party. As a result, we hold the *Penn Central* balancing test overall weighs in favor of Folly Beach, and the merger ordinance did not effect an unconstitutional taking of Braden's Folly's Lots.

## V.

Braden's Folly's super-beachfront house is one of a handful in Folly Beach that are unintentionally threatening the continued existence of the beach as a whole. In response, Folly Beach amended its merger ordinance to require the combination of jointly-held, undersized, contiguous lots that abut the beach. That merger ordinance is but one part of a coordinated effort by the city to protect the beach and the federal funding that keeps the beach from eroding away entirely.

In accordance with every other jurisdiction in the country that has addressed the constitutionality of merger ordinances, we find Folly Beach's ordinance is a reasonable land-use regulation. It is true that Braden's Folly is slightly burdened by the merger ordinance in that the ordinance restricts one method by which Braden's Folly could alienate its property. However, despite the impact of the merger ordinance, Braden's Folly generally retains a near-full "bundle of sticks" incident to its ownership of the Lots: it may continue to use the properties in the same manner it has for decades, it may alienate the properties as a single unit, and it may exclude others from the properties as it sees fit. *See Andrus*, 444 U.S. at 65–66. Moreover, any economic impact on the value of the Lots appears to be *de minimis*. We therefore hold the merger ordinance did not unconstitutionally take Braden's Folly's property without just compensation. As a result, we reverse the circuit court's entry of summary judgment in favor of Braden's Folly and remand to the circuit court to enter judgment for Folly Beach.

**REVERSED AND REMANDED.**

**BEATTY, C.J., FEW, JAMES, JJ., and Acting Justice Kaye G. Hearn, concur.**